UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SUSAN GALLOWAY and LINDA STEPHENS,

                        Plaintiffs,                No. 08-CV-6088 CJS(P)

     -vs-

                                            DECISION AND ORDER

TOWN OF GREECE and JOHN AUBERGER,
in his official capacity as Town of Greece
Supervisor,

                        Defendants.
_____

APPEARANCES

For Plaintiffs:             Ayesha N. Khan
                      Americans United for Separation of Church and State
                      518 C Street NE
                      Washington, D.C. 20002

                      David G. Jay
                      69 Delaware Avenue
                      Suite 1103
                      Buffalo, New York 14202-3811

For Defendants:           J. Michael Johnson
                      Alliance Defense Fund
                      P.O. Box 52952
                      Shreveport, Louisiana 71135

                      Laurence D. Behr
                      Barth, Sullivan & Behr
                      43 Court Street, Suite 600
                      Buffalo, New York 14202

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 1983[1], in which the plaintiffs, Susan Galloway and Linda Stephens ("Plaintiffs"), allege that the practice of the Town of Greece's ("Defendant" or "the Town") of opening Town Board meetings with prayer violates the Establishment Clause of the First Amendment to the United States Constitution. Plaintiffs, who are Jewish and Atheist, respectively, maintain that the Town has "aligned itself with" Christianity, because the vast majority of clergy selected to give prayers at town board meetings were Christian. In this regard, Plaintiffs contend that the Town has intentionally excluded non-Christians from offering prayers at meetings. Additionally, Plaintiffs contend that the town has impermissibly allowed "sectarian" prayer by members of both Christian and non-Christian faiths.

Now before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, Defendants' motion for summary judgment is granted, Plaintiffs' motion for summary judgment is denied, and this action is dismissed.

BACKGROUND

Defendant is a municipal corporation located in Monroe County, New York. Defendant John Auberger ("Auberger"), who is being sued in his official capacity, has, at all relevant times, been the elected Supervisor of the Town. At all relevant times the Greece Town Board has met once each month. Prior to 1999, the Town observed a moment of silence at the start of Town Board meetings. In 1999, the Town began

_____

[1] Complaint ¶ ¶ 82-83 ("The practices of excluding non-Christians as prayer-givers and of sponsoring sectarian prayers at Town Board meetings constitute the custom and policy of the Town of Greece, thereby subjecting the Town to liability under 42 U.S.C. § 1983. By violating the Establishment Clause . . . Defendants have . . . deprived Plaintiffs of rights secured by the First and Fourteenth Amendments to the U.S. Constitution, entitling them to a remedy under 42 U.S.C. § 1983."

inviting local clergy to offer oral prayer at the start of Board meetings.  Auberger

instituted this practice after observing that the Monroe County Legislature started its

sessions with prayer.  At all relevant times the Moment of Prayer was listed as part of

the Board's meeting agenda.

The Town has no written policy concerning prayer at Board meetings.  The

Town has never set any guidelines concerning the content of prayers, and has never

asked to review the wording of prayers prior to their delivery at Town Board Meetings.

Town Officials state that they would not censor an invocation, even if it was offensive,

or even if it was not a prayer in the traditional sense. Firkins Dep. 187, 231-232, 249-

251; Auberger Dep. 174-189.[2]  For example, the Town has indicated that Atheists are

welcome to offer "prayers."  The Town maintains that anyone who expressed an

interest in giving an invocation at a Town Board meeting would have been permitted to

do so, without having to provide any information concerning the content of the prayer.

The Town has never rejected a request to offer a prayer.  At the same time, however,

the Town has never publicized that individuals are welcome to offer prayers.

Religious groups in the Town[3] are predominantly Christian. Stephens Dep. at

29.  In that regard, although Plaintiffs have each lived in the Town more than thirty

years, neither was personally familiar with any mosques, synagogues, temples, or

---

[2]McCann indicated that if someone who indicated that they were from a "white supremacist church" asked to give a prayer, he would want to consult with legal counsel first. (McCann Dep. 104-105).

[3]It was the Town's preference and intention to invite representatives of churches or groups that were physically located in the Town of Greece. Firkins Dep. 148, 150-162; *see also, id.* at 153-154 ("The way in which the list was established . . . is to invite Greece – Town of Greece clergy, houses of worship, individuals to give the prayer, because this is the Town of Greece.").  However, Town employees were not specifically instructed to contact only those religious groups located within the Town. (Firkins Dep. 177).

other non-Christian places of worship within the Town. *See*, Stephens Dep. at 28-30; Galloway Dep. at 36-37.  More specifically, neither Galloway, Stephens, or Auberger for that matter, were aware of any Jewish, Muslim, Mormon, Buddhist, or Hindu houses of worship in the Town. Galloway Dep. at 36; Stephens Dep. at 28-29; Auberger Dep. at 63-64, 109.

At all relevant times, responsibility for inviting clergy to deliver prayers at Board meetings was delegated to the Town's Office of Constituent Services ("Constituent Services").[4]  Three Constituent Services clerical employees, Linda Sofia ("Sofia"), Geri Wagoner ("Wagoner"), and Michele Fiannaca ("Fiannaca"), were responsible for this task at different times.

<u>March 1999 - February 2005</u>

Sofia was the first employee given the job of inviting clergy to give prayers at Town Board meetings, and she performed that duty for most of the period at issue in this lawsuit, from approximately March 1999 until approximately February 2005. (Defendants' Statement of Undisputed Facts [#33-3] ¶ ¶ 17, 21).  Sofia arranged for clergy to give invocations by telephoning religious organizations that were listed in the "Community Guide," a directory published periodically by the Greece Chamber of Commerce.  Sofia randomly called organizations listed in the Community Guide until she found a clergy member who was willing to give an invocation.  The record does not contain copies of the actual Community Guide(s) published during the relevant period

---

[4]As will be discussed below, in recent years some individuals who are not clergy  have volunteered to give prayers.  However, the only people invited by the Town to give prayers have been clergy.

that Sofia performed this task. Instead, the record contains only a copy of a Community Guide dated "Spring/Summer 2006," published after Sofia ceased performing the task of inviting clergy. (Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 6). Defendants produced this copy as part of discovery, but indicate that they do not know from where this particular document came. (Defendants' Supplemental Discovery Responses, Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 8, response no. 10) ("Defendants do not know who provided this exact document.").

Sofia states that she never intentionally failed to contact any organization listed in the Community Guide. (Defendants' Statement of Undisputed Facts [#33-3] ¶ 17). On this point, Sofia, who was not deposed as part of this action, states in an affidavit: "I did not intentionally omit any church, but called all churches on the list until I was able to find a person who agreed to give a short invocation at the meeting. However, my recollection[5] of who I called and when is not clear at all." (Sofia Aff. [#33-11] ¶ 5). Sofia indicates that she never declined to contact an organization based on its religious affiliation. (*Id*. at ¶ 7).

In or about January 2003, Sofia began keeping a list of all clergy who agreed to give prayers at Town Board Meetings. (Defendants' Appendix to Local Rule 56.1 Statement, Exhibit 14, numbered pages 32-35). Sofia referred to the document as her "Town Board Chaplains" list, and indicates that the list was not intended to include all potential clergy, but only those who had accepted her invitations to give invocations.

_____

[5]The affidavit is dated January 20, 2009, some four years after Sofia last performed the job of inviting clergy.

(Sofia Aff. [#33-11] ¶ 6) ("I recorded the name of the person who agreed to give the short invocation. My list was not a list of all potential prayer-givers, but only those persons who I called and who agreed to give the invocation.").

Between March 1999 and February 2005, representatives of the following religious organizations gave invocations at Town Board meetings: Greece Assembly of God (14 times); First Bible Baptist Church (9 times); West Side Baptist Church (4 times); Holy Name of Jesus Church (2 times); Our Mother of Sorrows Church (8 times); St. John the Evangelist Church (1 time); St. Charles Borromeo Church (2 times); St. Lawrence Church (3 times); English Road Alliance Church (4 times); Shepherd's Heart Christian Fellowship (7 times); Hope Lutheran Church (1 time); Aldersgate United Methodist Church (4 times); Lakeshore Community Church (3 times); New Testament Christian Church (1 time); and John Knox Presbyterian Church (1 time).[6]

As noted earlier, the record does not contain contemporaneous Community Guide listings of religious organizations for the period 1999 through 2005. However, all of the religious groups listed above appear in the Spring/Summer 2006 Community Guide that is contained in the record. The 2006 listing also contains a number of religious groups that did *not* give invocations during the period March 1999 through February 2005 , and specifically: Greece Baptist Church, Latta Road Baptist Church, Our Lady of Mercy Church, St. Mark's Church, Trinity Episcopal Church, Northgate

---

[6]On May 13, 1999 and September 19, 2000, the Town Board observed a moment of silent prayer. (Plaintiffs' Appendix to Rule 56.1 Statement, Tab 33). On September 21, 1999, the Reverend Peg Shelton-Williamson, who is not identified with a particular group, gave the invocation. *Id.*

Bible Chapel, Lutheran Church of Concord, Messiah Lutheran, Greece United Methodist Church, Park Ridge Free Methodist, Wesley United Methodist Church, Church of Jesus Christ of Latter Day Saints, Immanuel Church of the Nazarene, Trinity Church of the Nazarene, Victory Community Church, The Good News Community Church, Lawson Road Church of Christ, New Way Christian Faith Center, Calvary Chapel of Greece, Abundant Life Worship Center, Bethany Presbyterian, Covenant Orthodox Presbyterian, Lakeview Community Church, and Parma Greece United. (Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 6). It is unclear whether any of these groups were listed in the earlier version(s) of the Community Guide that Sofia actually used. However, to the extent that they were, Sofia maintains that she would have called them to invite a representative to give a prayer, and that if a representative did not give a prayer, and thus did not appear on the Town Board Chaplains list, it was because he or she declined to do so. (Sofia Aff. [#33-11] ¶ ¶ 4-5, 7; Sofia Aff. [#37-5] ¶ 4).

<u>March 2005 - December 2006</u>

Between approximately March 2005 and "some time prior to 2007," Wagoner was given the responsibility for inviting clergy to deliver invocations at Town Board meetings. (Defendants' Statement of Undisputed Facts, ¶ ¶ 21, 25). Like Sofia, Wagoner was not deposed as part of this litigation, however, she too provided an affidavit. (Wagoner Aff. [#33-12]). When Wagoner assumed the job from Sofia, Sofia gave Wagoner her Town Board Chaplains list, which as discussed above, was a list of all individuals who had agreed to give prayers since January 2003. Subsequently, Wagoner used Sofia's Town Board Chaplains list to contact clergy. Wagoner may also

have used the Community Guide, although she does not specifically remember doing so.[78] (Wagoner Affidavit at ¶ 6).  Wagoner randomly called organizations listed on the Town Board Chaplains List, and possibly the Community Guide, and did not intentionally fail to call any group. (*Id.* ¶ ¶ 6, 8) ("There were no churches that I specifically did not call.").  Wagoner never rejected a request by anyone to give a prayer. (*Id.* at ¶ 8).

Between March 2005 and December 2006, representatives of the following religious organizations gave invocations at Town Board meetings: First Bible Baptist Church (1 time); West Side Baptist Church (1 time); Holy Name of Jesus (1 time); Our Lady of Mercy (1 time); Our Mother of Sorrows (1 time); St. John the Evangelist (1 time); St. Lawrence Church (1 time); English Road Alliance Church (1 time); Messiah Lutheran (1 time); Hope Lutheran Church (1 time); Park Ridge Free Methodist (1 time); Trinity Church of the Nazarene (1 time); Lakeshore Community Church (1 time); Calvary Chapel of Greece (2 times); Covenant Orthodox Presbyterian (1 time); and Lakeview Community Church (2 times).

All of the religious groups which Wagoner invited to give prayers were listed in the Community Guide dated Spring/Summer 2006.[9]  The 2006 listing also contains a

---

[7]As noted below, Wagoner could not have relied solely on Sofia's list, since Wagoner invited at least five organizations to give prayers which had not given prayers during Sofia's tenure.

[8]Later, Wagoner received a spreadsheet ("the spreadsheet") containing a list of religious groups, though there is no evidence who prepared the list.  There is also no evidence that Wagoner actually used the list, and to the contrary, Wagoner stated that she used Sofia's list and possibly the Community Guide.

[9]This fact supports Wagoner's recollection that she may have used the Community Guide in addition to the Town Chaplains list, since at least five of the organizations which gave prayers during Wagoner's tenure had not given prayers during Sofia's tenure.

number of religious groups that did not give any invocations between 1999 and 2006, and specifically: Greece Baptist Church, Latta Road Baptist Church, St. Mark's Church, Trinity Episcopal, Northgate Bible Chapel, Lutheran Church of Concord, Wesley United Methodist Church, Church of Jesus Christ of Latter Day Saints, Immanuel Church, Victory Community Church, Good News Community Church, Lawson Road Church of Christ, New Way Christian Faith Center, Abundant Life Worship Center, Bethany Presbyterian, and Parma Greece United.

<u>January 2007 - Present</u>

In or about January 2007, Fiannaca was assigned the task of inviting clergy to give prayers at Town Board meetings. At that time, Wagoner gave Fiannaca an accumulated file of information concerning potential prayer-givers, consisting of Sofia's Town Board Chaplins list and additional information that Wagoner had compiled. Subsequently, Fiannaca used the lists that she received from Wagoner, and updated them with the names of religious organizations appearing in the Religious Services Directory of the Greece Post, a weekly local newspaper. Fiannaca described her practice of inviting clergy to give prayers, as follows:

> I . . . believe that [Wagoner] gave me a spreadsheet list of churches in addition to a document entitled 'Town Board Chaplains.' I used these documents, as well as the Greece Post [newspaper], to randomly call persons to give the short invocation. I constantly kept the list updated by writing notes on the lists for my use. In addition, I have received letters or post-it notes about certain churches, that I put in this file.

Fiannaca Aff. [#33-10] ¶ 6. Fiannaca periodically reviewed the list of religious organizations published in the Greece Post, and updated her list with any new listings. Fiannaca Affidavit at ¶ 6; Fiannaca Dep. at 21-23, 25. Fiannaca would also cross out

the names of individuals, but only if they were no longer associated with a particular church, or if they asked to be removed from the list. Fiannaca Dep. at 9-10, 37. Fiannaca intended that her list would include every religious organization listed in the Greece Post. *Id*. at 21-22, 24. Fiannaca never used the Community Guide or the yellow pages to invite clergy. *Id*. at 27.[10] Fiannaca believed that she was only supposed to invite individuals from religious organizations geographically located within the Town of Greece, and she believed that the organizations on her list fit that description. *Id*. at 14-17.

Fiannaca randomly called churches or clergy on her list, until she found someone who was willing to give the invocation. Fiannaca Dep. 6-7, 11-12, 51. However, there were certain clergy on the list who Fiannaca felt she could call whenever she could not find anyone else, because they would always agree to give the invocation. Fiannaca Dep. at 53-54. Fiannaca stated that she had called everyone on her list at one time or another. Fiannaca Dep. at 10. In that regard, Fiannaca indicated that she believed she called the Bahai faith group in or about 2006. *Id*. at 62-63. Upon further questioning, Fiannaca stated that she was not sure whether she was thinking of the Bahai group or another church, the Morningstar church, but that if she had to bet, she believed it was the Bahai group. *Id*. at 70 ("If I'm going to bet, I think it was Bahai. But then I'm thinking, geez, I'm wondering if it was the Morningstar one that I was talking about. I don't know."); *see also, id*. at 73 ("I think I did [call Bahai] a

---

[10]Fiannaca was not familiar with the copy of the Greece Community Guide in the record, and stated that she never used it to call clergy. (Fiannaca Dep. 25-27, referring to Exhibit 45, Greece Community Guide Spring/Summer 2006).

couple of years ago when I first saw them, but I don't remember, but I'm thinking it could have been Morningstar.  It was one or the other, *but you know what?  I have called practically everybody on that list*.") (emphasis added).  Fiannaca never rejected any request to give an invocation. Fiannaca Aff. at ¶ 12.

As part of discovery in this action, the Town produced the file that Fiannaca used when inviting clergy to give invocations.[11]  The file included Sofia's Town Board Chaplain list, as well as lists compiled by Wagoner and possibly others. *See*, Plaintiff's Appendix to Local Rule 56.1 Statement, Tab 7 (Consisting of the file that Wagoner gave Fiannaca, as subsequently updated by Fiannaca).  More specifically, in addition to the Town Board Chaplain list, the file contained a document with the handwritten title "new list," which appears to have been created prior to October 2006.[12] (Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 7, pp. 6, 15).  The list contains the names of thirty-two religious organizations, and includes all of the names listed in the Spring/Summer 2006 Community Guide, except: Church of Jesus Christ of Latter Day Saints, Abundant Life Worship Center, Parma Greece United, Immanuel Church of the Nazarene, Victory Community Church, The Good News Community Church, and the New Way Christian Faith Center.

The file also contained a document dated "10/2/2006," entitled "MasterPeopleListQuery." Plaintiff's Appendix to Local Rule 56.1 Statement, Tab 7, pp.

---

[11] Fiannaca Aff. [#33-10] ¶ 6 ("The lists that I call from were used during the depositions in this case and was referred to as Exhibit 52 [Plaintiff's Appendix to Local Rule 56.1 Statement, Tab 7].").

[12] The list has names handwritten on it, which are later incorporated into a typed list that is dated October 2, 2006, discussed further below.

24, 28.  The list contains thirty-seven names, and includes all of the organizations

listed in the Greece Community Guide "Spring/Summer 2006" except five: Church of

Jesus Christ of Latter Day Saints, Immanuel Church of the Nazarene, Victory

Community Church, Abundant Life Worship Center, and Parma Greece United. *Id*.

The list also contains three organizations that do not appear in the Spring/Summer

2006 Community Guide: Trinity Church, Destiny Prepar [sic] Church, and Morning Star

Church. *Id*.  The list also contains all of the organizations listed in an undated copy of

the Religious Services Directory from the Greece Post, which appears in the record,

except for nine: Abundant Life Worship Center; Baha'i Faith; Christian Bible Church;

Episcopal Church of the Ascension; Journey Christian Church; Lakeside Presbyterian

Church; St. George's Episcopal Church; Victory Community Church; and Victory

Mountain Christian Fellowship. Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab

5.[13]

The file also contains a spread-sheet type document dated "2/20/2007."

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 7, pp. 14, 16.  There is

essentially no testimony from Fiannaca concerning this document, except that she

testified that she did not personally type the document.  The list contains the names of

the same thirty-seven organizations that appear on the "10/2/2006" list, and is

alphabetized.

Another updated list in Fiannaca's file is dated March 13, 2008, contains forty

---

[13]Fiannaca stated that she received this list from Wagoner, along with Sofia's Chaplain's list. Fiannaca Dep. 34 ("I think that this might have been our original list.").

names.[14]  The list is essentially the same as the "2/20/2007" list, except that it adds

four additional names: Baha'i Faith,[15] Victory Community, Journey Christian Church,

and Christian Bible Church. Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 7,

pp. 9-10.  As mentioned earlier, these names appear on the undated copy of the

Greece Post that is in the record, but did not appear on the "10/2/2006" list.

Fiannaca also added names to her lists when asked to do so. (Fiannac Dep. at

8).  For example, after this litigation was commenced, Fiannaca added Jen Zarpentine

("Zarpentine"), a Wiccan Priestess, and Dave Chikowsky ("Chikowsky"), a Jewish

layman, to the list at their request. (Fiannaca Dep. at 18, 29).

Between January 2007 and December 2008, representatives of the following

religious organizations gave invocations at Town Board meetings: First Bible Baptist

Church (3 times), Our Mother of Sorrows (2 times), St. John the Evangelist (1 time),

New Testament Christian Church (1 time), Greece Assembly of God (3 times), St.

Charles Borromeo (2 times), Morning Star Christian Fellowship (1 time), Lakeshore

Community Church (1 time), Lakeview Community Church (1 time), Covenant

Orthodox Presbyterian Church (1 time), St. Mark's Church (1 time), Our Lady of Mercy

(1 time), The Savior's Chapel (1 time), Aldersgate United Methodist Church (1 time),

---

[14]On or about March 13, 2008, Fiannaca apparently received the updated list, without phone numbers, from Gail Burge ("Burge"), Auberger's secretary. Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 7, pp. 9-10.  Fiannaca belives that Burge may have provided her with the list of names and addresses, and directed her to write in the updated telephone numbers. Fiannaca Dep. 31-33. However, Fiannaca is not absolutely sure who provided her with the typed portion of the document. Fiannaca Dep. at 68-69.

[15]Specifically as to the Baha'i faith organization, Fiannaca indicated that she added the group after its name appeared in the Greece Post. See, Fiannaca Dep. at 36-37 (Stating that she added three organizations after she saw them in the Greece Post: "New Way Christian Faith, Victory Mountain Christian Fellowship, and Baha'i Faith.").

and Baha'i Assembly of Greece (1 time). (Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 32). Additionally during this period, Chikowsky delivered prayers on two occasions, and Zarpentine delivered a prayer on one occasion. (*Id*).

Neither Sofia, Wagoner, nor Fiannaca has ever attended a Town Board meeting or heard a prayer delivered by any of the individuals whom they invited to deliver invocations. There is no evidence in the record that Sofia, Wagoner, or Fiannacca have any religious affiliation or beliefs, or that they hold any views concerning the religious groups discussed in this Decision and Order.

As for the geographic location of the various religious groups discussed in this action, Plaintiffs have submitted an exhibit, consisting of a "Google Earth" map, which purports to show the "locations of certain religious institutions in and around the Town of Greece." Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 22, Tievsky Aff. ¶ 4. The map[16] shows that the vast majority of religious organizations on the Town's prayer lists are located within the Town of Greece. The map does not show any Jewish synagogues, Churches of Jesus Christ of Latter Day Saints, or Baha'i faith organizations, as being located within the Town of Greece. *Id*.

The map further indicates the presence of "Chua Tanh Tinh Temple of Tranquility," a Buddhist temple, and an unnamed "Jehovah's Witnesses" church,[17]

---

[16] *Id*., Ex. 80

[17] As purported proof that the Town was aware of the Jehovah's Witness congregation, Plaintiffs have submitted an exhibit, indicating that "Ridgeway Congregation of Jehovah Witnesses" applied to the Greece Town Board to have a parcel of land located at 1700 Long Pond Road re-zoned from a general business location to a single-family residential, and for permission to operate a church at the location. (Plaintiff's Appendix to Local Rule 56.1 Statement, Tab 23, Ex. 81). The exhibit indicates that the Town Board reserved decision on the application. *Id*. However, the Court takes judicial notice of the fact that the "Jehovah's Witnesses" church depicted on Plaintiffs' Google Earth map is located several miles north of

within the Town of Greece, neither of which appeared on the Town's prayer lists. There is no indication that either of these organizations were ever listed in the Community Guide or the Greece Post.

The map also purports to show that the following organizations are located *outside* of the Town of Greece: Abundant Life Worship Church, Church of the Ascension Episcopal, Congregation B'Nai Israel, Good News Community Church, Lakeside Presbyterian Church, Morning Star Missionary Baptist, St. George's Episcopal Church, Temple Beth David, Temple Emanu-El, and Wesley United Methodist Church. *Id*. Of these, the only ones that appear on any of the Town's prayer lists[18] are: Good News Community Church, located in Spencerport, and Wesley United Methodist Church, located in the City of Rochester. Wesley United is listed in both the Community Guide and the Greece Post, and Good News is listed in the Greece Post.[19] Although the Abundant Life Worship Center appears on both the Community Guide list and the Greece Post list, and St. George's Episcopal appears in the Greece Post listing, both churches indicate that they are located in the neighboring Town of Hilton, not the Town of Greece.

Many of the prayers that were given at Board meetings were explicitly Christian,

---

1700 Long Pond Road.

[18]The map purports to show that a "Morning Star Missionary Baptist"church is located outside of the Town of Greece. Specifically, Plaintiffs' map depicts the Morning Star Missionary Baptist church located at 899 Hudson Avenue, Rochester, NY 14621. However, the organization on the Town's list is Morning Star Christian Fellowship Church, which is listed as having an address within the Town of Greece, at 36 Heritage Woods Court, Rochester, NY 14615.

[19]The following religious organizations located outside of Greece appear in either the Community Guide or Greece Post: Abundant Life (Community Guide & Greece Post); Good News Community Church (Community Guide); Lakeside Presbyterian (Greece Post); Wesley United (Community Guide & Greece Post).

and referred to Jesus or Jesus Christ. Many of the prayers end with the phrase, "in Jesus' name," or similar language. Plaintiffs, who are not Christians, found such prayers offensive and inappropriate. In September 2007, Plaintiffs began complaining to the Town regarding the prayers.

Stephens is an atheist and does not consider herself to be religious. Stephens Deposition at 12. On one occasion, Stephens attended a church service at the request of her cousin, and was offended because the service was "so exclusive. It's ... aimed at a particular group of people that my values diverge from theirs [sic]." *Id*. at 14. Stephens believes that there is "a strict separation between church and state." *Id*. at 23. Stephens believes that prayers given in the U.S. Congress are inappropriate, because prayers "have no part in the government." *Id*. at 20; *see also, id*. at 38: "I personally, what I think the government should be doing is to take the whole question out of government. You know, that's my preference."[20] In that regard, Stephens finds all legislative prayers to be offensive, and finds that "sectarian prayers" are "more offensive than nonsectarian ones." *Id*. at 20. Stephens maintains that sectarian prayers "are not as inclusive as nonsectarian prayers, and we have diversity in the Town of Greece as well as in this country, so [nonsectarian prayers are] more acceptable." *Id*. at 31. Stephens states that her goal in this lawsuit is to stop "certain kinds of prayers," namely "sectarian" prayers, by which she means "prayers that invoke a particular religion," or "the particulars of a particular religion." *Id*. at 21, 30. Stephens indicates that *non*sectarian prayer "encompasses the three major religions." *Id*. at 39.

---

[20]At the same time, Stephens states, as far as prayer: "I think probably the best thing to do would be to follow the example of what's done in the U.S. Congress, use their guidelines." (*Id*. at 36).

16

Stephens initially stated that a prayer containing a reference to Allah would be sectarian, because it evokes a particular religion. *Id*. at 32. Subsequently, though, she stated that she did not know whether such prayer could be nonsectarian. *Id*. at 34-35. Stephens states that a prayer ending with the words "in Jesus's name," or which included the names Jesus, Jesus Christ, or Holy Spirit, would be sectarian. *Id*. at 45, 64-65. However, Stephens states that the terms God, Almighty, Lord God, and Father, are acceptable. *Id*. at 65. It is fair to say that Stephens personally opposes all legislative prayer, but accepts the idea that legislative prayer is lawful if it does not invoke a particular religion. *Id*. at 20-21. Stephens has attended numerous Town Board meetings at which prayers have been given. Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 10, Stephens Aff. ¶ 9.

Galloway also believes that prayer is inappropriate at government meetings. Galloway Dep. at 49 (Stating that she should not "be forced to sit through a meeting – a prayer, a religious prayer when I come for the Town Board meetings"); *see also, id*. at 45 (Stating that prayer "should not be part of our government meeting."). Galloway states that sectarian prayer "is generally specific to one religion, and nonsectarian is more inclusive and I'd like to say universal but, you know, I know not everybody even in a nonsectarian prayer is — you know, is covered, or whatever you want to call it." *Id*. at 8). She adds, "I believe that [legislative] prayers should be as inclusive as possible, and I also believe that there should be no reference to – that would be taken as specific to one religion." *Id*. at 18. In that regard, Galloway further states: "I'm asking them to make them [the prayers] nonsectarian so that they are inclusive to the . . .

majority of the people, to different faiths.  I realize that that will not probably please all [people]." *Id*. at 53.   According to Galloway, a nonsectarian prayer is "not specific to necessarily one religion." *Id*. at 9.  Galloway believes that a prayer to "Father," "God," and "Lord God"  would be nonsectarian. *Id*. at 13, 17, 52.  On the other hand, Galloway states that a prayer including the name Jesus would be sectarian, regardless of whether it was uttered by a Catholic, a Protestant, or a Mormon. *Id*. at 19-20. Similarly, Galloway states that a Wiccan prayer using the name "Apollo," or a prayer to polytheistic gods, would be sectarian. *Id*. at 23, 25.  Galloway indicates that prayers using the names Jehovah, Allah, Abba Father, and Alpha and Omega are also sectarian. *Id*. at 60, 64.  Galloway states that in the context of legislative prayer, if a legislature cannot determine whether a particular term is sectarian or not, it should investigate whether the term is "truly nonsectarian or sectarian." *Id*. at 64.  Galloway has attended numerous Town Board meetings at which prayers have been given, including meetings on January 16, 2007, September 18, 2007, October 17, 2007, and July 15, 2008. Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 9, Galloway Aff. ¶ ¶ 7-8.

On September 18, 2007, Galloway addressed the Town Board and accused it of "promoting the Christian religion." Pl. Stmt. Of Facts ¶ 411.  More specifically, Galloway stated:

> I find that it is a promotion of religion when you have preachers come in here and say, 'in Jesus Christ our Lord,' or 'in the Holy Spirit.' . . . Supposedly we are considered a secular country, and thus we should not have a mingling of church and state. . . . I hope this will be addressed because this is not okay to have Christian religion introduced into our town board.  There is a separation of church and state and it needs to be

kept that way.

*Id.* On September 24, 2007, Plaintiffs met with Town officials and complained about "the sectarian prayers." *Id.* at ¶ 412. During this meeting, in response to Plaintiffs' question, the Town told Plaintiffs that an Atheist could give the invocation if he or she wanted. Def. Stmt. Of Facts ¶ 12. Plaintiffs allege that Town officials also told them that if they did not like the prayer that was being offered, they could leave the meeting. In October 2007, Galloway again complained about the prayers being "sectarian instead of nonsectarian." Pl. Stmt. Of Facts ¶ 414.

Plaintiffs maintain that most of the prayers offered during the relevant period were "sectarian." Specifically, Plaintiffs contend that, between 1999 and early 2009, 73.6%[21] of the challenged prayers "included sectarian language or references." Pl. Stmt. of Facts ¶ 317.[22] Plaintiffs maintain that during some years, the prayers were up to 90% sectarian. *Id.* at ¶ ¶ 318-397. In 2008, the prayers were 58.3% sectarian, according to Plaintiffs. *Id.* at ¶ 398.

Many of the allegedly sectarian prayers are indistinguishable from prayers that Plaintiffs find unobjectionable, except that they end with the phrase, "in Jesus' name," or similar words. Some of the allegedly sectarian prayers do not mention the name of

---

[21]This percentage is suspect in the Court's view, based upon the discussion below, which indicates that some of the allegedly sectarian prayers are indistinguishable from prayers that Plaintiffs contend are nonsectarian.

[22]After briefing was completed, Plaintiffs, with the Court's permission, submitted supplemental exhibits, which show that prayers referencing the name of Jesus or Jesus Christ, or praying "in Jesus's name," were also given on the following dates: May 19, 2009, June 16, 2009, August 18, 2009, September 15, 2009, December 15, 2009, February 16, 2010, March 16, 2010, May 18, 2010, and June 15, 2010. (Pl. Exhibits 619-629). As with the other prayers discussed above, these prayers are essentially indistinguishable from prayers that Plaintiffs characterize as being nonsectarian, except that they close with the words, "in Jesus's name." *Id.*

Jesus.  In the remainder of this paragraph, the Court will set forth a number of prayers that were given at Town Board meetings, which Plaintiffs maintain are sectarian:

> For our prayer this evening I selected a paraphrase on the psalms.  Very important part of your Judeo-Christian heritage, and this is a paraphrase particularly appropriate tonight.  It's called the psalm of icy awareness.  The earth around my home is now locked in a winter wrap of bone-chilling ice and snow.  Water once clear and liquid, a joyous flowing community is now frozen into crystals of ice.  Recently in humanity's long history, there has arisen an isolation, a separation of those who share common, human flesh and bone.  While once upon a time we gathered joyfully in families , tribes and clans, we now so often live divorced from earth and from each other with loneliness as our only company.  All isolation is ice-olation.  Frigid to human flesh, cold and lifeless to the touch, untrue to our most basic unity: Community.  And whenever I act singlehandedly apart from an awareness of my sisters and brothers, I become a deformed disciple, tribeless, O God.  How can I tread the path which you perfectly made, fully alive Adam.  It is not good for one to be alone.  Help us Lord in this time that we spend this night, this cold winter night, help us to learn the interrelationship we have with one another and to be strengthened in our ties to one another that we might build up our community and your kingdom.  We make this prayer with confidence in your love for us.  Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 515, (1/18/00 prayer by Rev. Edward Palumbos); *Id*. Tab 32, Exhibit 500.

> So this evening let's just for a moment, very quietly and peacefully, place ourselves in the presence of God, who dwells within us.  Blessed are you Lord, God of all creation, whose goodness fills our hearts with joy.  Blessed are you who have brought us together this day to work in harmony and peace.  Strengthen us with your grace and wisdom, for you are God forever and ever.  May the Lord bless you and keep you.  May his face shine upon you and be gracious to you.  May he look upon you with kindness and give you his peace.  Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 520, (6/20/00 prayer by Fr. Frank Falletta); *Id*. Tab 32, Exhibit 500).

> Heavenly Father, you guide and govern everything with order and love.  Look upon this assembly of our town leaders and fill them with the spirit of their wisdom.  May they always act in accordance with your will, and

may their decision be for the well being of all.  The Lord bless you and keep you.  The Lord let his face shine upon you and be gracious to you.  The Lord look upon you kindly and give you peace.  Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 571 (11/16/04 prayer by

Fr. Frank Falletta); *Id*. Tab 32, Exhibit 500.

> From Psalm 127: 'If the Lord does not build the house, in vain do its builders labor.  If the Lord does not watch over the city, in vain does the watchman keep vigil.  In vain is your earlier rising; your going later to rest.  You who toil for the bread you eat, when he pours gifts on his beloved while they slumber.' O God of justice and mercy, be so [bestow] your gracious blessings upon the members of this town board and upon all who are gathered here.  Help the deliberations of this evening to be without contentiousness or any spirit of partisanship, but directed for what is good for all the residents of this town.  Help us to plan well, to execute diligently and to bring to fruition the hopes that we have for the future.  O God bestow your blessing upon us, upon our families, and upon all who will benefit from the activities of this evening's meeting.  Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 590 (3/20/07 prayer by

Fr. John Forni); *Id*. Tab 32, Exhibit 500.

> May the glory of the Lord be forever.  May the Lord find delight in his works.  May the name of the Lord be blessed from now on to eternity from the rising sun to its setting, and the name of the Lord is praised.  The Lord is high above all nations.  His glory transcends the heavens.  O Lord your name is forever.  Your remembrance Lord is throughout all generations.  The Lord has established his throne in the heavens and his kingship has dominion over all.  The heavens will rejoice, the earth will exalt, and among the nations they will proclaim, 'The Lord reigns.  The Lord was king, the Lord is king, and the Lord shall be king forever and ever.  The Lord reigns for all eternity.' Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 603 (7/15/08 prayer by

Jewish layman Dave Chikovsky); *Id*. Tab 32, Exhibit 500.

> O thou kind Lord, this gathering is turning to Thee, these hearts are radiant with Thy love . . . .  Thou art mighty, Thou art powerful, Thou art the giver, and Thou art the ever bounteous.  Alláh-u-Abhá.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 614 (12/16/08 prayer by

Thomas Lynch of Baha'i Community of Greece); *Id*. Tab 32, Exhibit 500.  Again,

Plaintiffs maintain that all of the foregoing prayers are *sectarian*. Plaintiffs' Appendix to

Local Rule 56.1 Statement, Tab 32.  In that regard, Plaintiffs contend that these

prayers are sectarian even though they do not mention the name of Jesus. Pl. Appx. to

Rule 56.1 Stmt., Tab 32.

On the other hand, Plaintiffs maintain that some of the prayers offered at Town

Board meetings were non-sectarian.  For example, Plaintiffs contend that the following

prayers are *not* sectarian:

> Good evening, [indistinct] bow your heads[23] with me? . . .  I pray it would
> be with the wisdom of God, that you would lead and direct the course of
> affairs tonight, and that much would be accomplished, that your will
> would be done, and that your kingdom would be established in this
> community on earth as it is in heaven.  We pray these things in your
> name, Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 547 (9/17/02 prayer by

Pastor Doug Morgante); *Id*. Tab 32, Exhibit 500.

> Let us join our hearts and minds together in prayer.  Lord as we are here
> to make decisions, Lord we call on your wisdom, your care for us, Lord
> we ask that all decisions that are made this evening are made to your
> honor and glory, and may your name be praised.  And Lord we just thank
> you for the opportunity we have to gather together, but also the
> opportunity and also the responsibility that you've given us tonight, just
> make those decisions on behalf of the people of Greece.  We pray this in
> our precious Lord's name, amen.

---

[23]Plaintiffs indicate that a request to "bow your heads" is not sectarian.  However, Plaintiff
Stephens nevertheless finds such a request offensive and inappropriate. (Second Supplemental Stephens
Declaration, Plaintiffs Appendix to Local Rule 56.1 Statement, Tab 40, Ex. 487, ¶ 5; ¶ 9 "[I]nstructing the
audience to bow for the prayer placed me in the uncomfortable position either of drawing attention to
myself as a non-Christian by declining to bow and participate in the prayer, or of contravening my own
beliefs about religion by participating in a prayer to Jesus.")

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 579 (11/17/05 prayer by

Pastor Timothy Bush); *Id*. Tab 32, Exhibit 500.

> God of all creation whose power is greater than ourselves. We pray this evening for the members of our town board who are entrusted with governance, welfare and common good of our citizens. May the work of their hands be blessed. Send the spirit of wisdom and right judgment upon them as they discuss, deliberate, listen and make decisions. As their constant companion, may their service to the citizens of the Town of Greece further the cause of harmony, peace and justice. Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 604 (8/19/08 prayer by

Pastor John Firbo); *Id*. Tab 32, Exhibit 500.

> Now I'd invite you to please rise for the opening prayer of this session this evening. [all stand] We pray God of all heaven and earth, we invoke your care, your guidance and your spirit of life this evening. Guide this assembly of board members in their responsibilities. Guide them with your grace of wisdom. Guide them by your justice. Comfort them in your mercy and protect them with power. Make them prudent in all their judgments. Make them steadfast in their work. Keep them patient in all they do. Keep them humble in their successes and joyful in all things. Let us pray. Watch over them O God as they go about their work. Protect them from all things that could come in conflict with serving you with sincerity and love. Keep them ever mindful of their goals. Give them fortitude to accomplish all that they set out to do for your honor and glory, and for the good of the people they serve. May your wisdom and blessings come down upon all gathered here this evening as we raise up our prayer to you who is the God of all goodness and peace. And may God's blessings be upon the Town of Greece, its residents and public service - servants, and may God bless this Town of Greece, and may God bless America forever and ever. Amen.

Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 610 (7/17/07 prayer by

Rev. Tim Brown); *Id*. Tab 32, Exhibit 500. Again, Plaintiffs indicate that the foregoing

prayers are non-sectarian. Plaintiffs also maintain that prayers using the following

terms and phrases are not sectarian: "Heavenly Father;"[24] "In the company with the blessed Lord, may we see the face of Almighty God;"[25] "Creator and ever-creating God, you have given us the image of a kingdom of Heaven or a kingdom of your realm as the ideal to which our human settlement should strive;"[26] and "Gracious sovereign Lord God."[27] Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 32, Exhibit 500.

On February 28, 2008, Plaintiffs commenced the instant action. Plaintiffs allege that the Town violated the Establishment Clause by aligning itself with "a single faith," meaning Christianity. In that regard, the Complaint states:

> The Greece Town Board has a longstanding practice of inviting clergy to open the Board's monthly meetings with a prayer. Over the past four years, every clergymember but one who delivered a "Moment of Prayer" has been Christian. The Board has neither suggested nor required that prayer-givers present inclusive, nonsectarian entreaties. As a result, the vast majority of prayers during the past four years have been explicitly Christian in content.
>
> By sponsoring persistently sectarian – and almost exclusively Christian – prayers, the Town Board has publicly aligned itself with a single faith. In so doing, the Board sends the message to non-Christians that they are unwelcome at Board meetings and that the Board does not represent non-Christian's concerns.
>
> Making non-Christians second-class citizens in the body politic runs afoul of the United States Constitution. Accordingly, Plaintiffs seek, through the filing of this lawsuit, to ensure that Defendants cease employing sectarian practices in the context of Town Board meetings.

---

[24](Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 510, 8/17/99 prayer by Fr. Falletta; *Id*. Tab 32, Exhibit 500).

[25](Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 546, 8/20/02 prayer by Father Micky McGrath; *Id*. Tab 32, Exhibit 500).

[26](Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 529, 2/209/01 prayer by Rev. Bill Burdick; *Id*. Tab 32, Exhibit 500).

[27](Plaintiffs' Appendix to Local Rule 56.1 Statement, Tab 33, Ex. 567, 7/209/04 prayer by Rev. Charles Roberts ; *Id*. Tab 32, Exhibit 500).

Complaint ¶¶ 1-3.  On the other hand, Plaintiffs also object to Chikowsky's "sectarian"

Jewish prayer. *Id*. at ¶ 71.  Plaintiffs describe the alleged "Establishment Clause

Violation" as follows:

> The Establishment Clause of the First Amendment to the U.S.
> Constitution provides that 'Congress shall make no law respecting an
> establishment of religion.'  The Establishment Clause applies with full
> force and effect to the acts of local officials under the Fourteenth
> Amendment[.]
>
> Defendants' practices of favoring Christian clergy and prayers at Town
> Board meetings have the purpose and effect of promoting, advancing,
> favoring and endorsing the Christian religion, and have a coercive effect
> on children present at Town Board meetings.
>
> These practices convey the message that the Christian religion is favored
> or preferred by the Town over other religions *and over nonreligion*.  The
> practices send the message to adherents of the Christian religion that
> they are political insiders, and simultaneously send the message to non-
> Christians that they are political outsiders.

Complaint ¶¶ 77-79 (emphasis added).  Plaintiffs allege that Defendants have a policy

and practice "of excluding non-Christians as prayer-givers and of sponsoring sectarian

prayers," in violation of the Establishment Clause. *Id*. at ¶ 82.  Plaintiffs demand

declaratory and injunctive relief, nominal damages, and attorney's fees and costs. *Id*.

at ¶¶ 84-87.  As for declaratory relief, Plaintiffs seek a declaration that "Defendants'

prayer practices violate the U.S. Constitution." *Id*. at ¶ 84.  As for injunctive relief,

Plaintiffs seek a permanent injunction ordering the Town "to refrain from employing

sectarian practices in the context of Town Board meeting prayers." *Id*. at 85.

Following discovery, the parties filed the subject cross-motions for summary

judgment.  In support of their motion, Plaintiffs contend, first, that they have standing to

challenge the Town's practices, since they were exposed to the allegedly unconstitutional practices at Town Board meetings.

Next, Plaintiffs maintain that all sectarian legislative prayer violates the Establishment Clause, and that only "non-sectarian, broadly inclusive prayers are constitutionally permissible." Pl. Memo of Law [#32-1] at 8.[28]  Plaintiffs insist that, "[t]hose [prayers] that use the terminology of, or are otherwise associated with, any particular faith or denomination, are not." *Id*.  As to their position, Plaintiffs interpret the U.S. Supreme Court's decision in *Marsh v. Chambers*, 463 U.S. 783 (1983) ("*Marsh*"), and the court's subsequent decision *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 603 (1989) ("*Allegheny*"), as mandating that legislative prayer be "nonsectarian." *Id*. at 10.  According to Plaintiffs, legislative prayer "should be inclusive and ecumenical." *Id*. at 17.  Plaintiffs argue that "sectarian language alone offends the Establishment Clause because it, by its very nature, associates the government with one faith." Pl. Reply Memo [#43] at 3.[29]  Plaintiffs maintain that the Town must warn invited clergy that their prayers should be "inclusive" and "omit references to any particular deity." Pl. Memo of Law in Opposition [#38] at 7-8. Plaintiffs insist that the Town need not inquire into the content of prayers, and can "reasonably assume" that individuals who accept the invitation to offer prayer will make

---

[28]*See also*, Pl. Reply Memo at 3 ("[W]hile aggressively proselytizing may compound a violation, sectarian language alone offends the Establishment Clause because it, by its very nature, associates the government with one faith.")

[29]In this regard, Plaintiffs are taking a more aggressive posture than that taken by the American Civil Liberties Union ("ACLU") in the *Pelphrey* case, discussed further below.  In that case, the plaintiffs argued that *frequent* sectarian references in legislative prayer violated the Establishment Clause, but *isolated* sectarian references did not. *Pelphrey v. Cobb County, GA*, 448 F.Supp.2d 1357, 1365 (N.D.Ga. 2006), *aff'd*, 547 F.3d 1263 (11th Cir. 2008).

a good-faith effort to comply with the Town's request. *Id*. at 13.

Additionally, Plaintiffs contend that the Town's procedure for selecting clergy is unconstitutional, since it "prefers Christianity over other faiths." Pl. Memo of Law [#32-1] at 18.  Plaintiffs maintain that such preferential treatment was intentional, and that "[t]he Town has systematically excluded minority-faith prayergivers." Pl. Memo in Opposition [#38] at 1.  In particular, Plaintiffs state that Sofia, Wagoner, and Fiannaca refused to include minority-faith groups on the Town's lists of clergy. Pl. Reply Memo [#43] at 11 ("[T]here is credible evidence that Sofia,Wagoner, and Fiannaca each used multiple resources to compile the official prayergiver list, yet consistently and purposefully excluded the minority faiths [listed] in those resources.").  Plaintiffs allege that the Town refused to extend invitations to churches that were listed in the Greece Post and Chamber of Commerce Community Guide and "ignored anecdotal information about local minority-faith communities. Pl. Memo in Opposition [#38] at 15-16.  On this point, Plaintiffs contend that the Town excluded those of the Mormon, Jehovah's Witness, Buddhist, and Bahai faiths. Pl. Memo of Law [#32-1] at 20. Plaintiffs also complain that the Town failed to publicize the fact that citizens are permitted to offer prayers. *Id*. at 23[30] (Stating that the Town has not "done any outreach to add minority faiths to their lists of potential invitees.").

In response, Defendants contend, at the outset, that the claims against Auberger in his official capacity should be dismissed, since they are merely repetitive

---

[30]In their Reply papers, Plaintiffs admit that there are issues of fact that preclude summary judgment as to the constitutionality of the Town's selection procedure.  Specifically, Plaintiffs state that "whether the omissions were driven by religious animus, rather than carelessness, has been put in dispute by the Town's filings." (Pl. Reply Memo at 7).

of the claims against the Town.

Defendants further maintain that Plaintiffs lack standing to challenge the Town's legislative prayer practice, since they did not suffer any injury. In that regard, Defendants state that Plaintiffs were never denied the opportunity to give an invocation, and that merely being exposed to sectarian prayer is not an injury where such prayer does not proselytize or disparage other faiths. Additionally, Defendants contend that Plaintiffs could not be harmed by the exclusion of certain religious congregations from the Town's list, since Plaintiffs were not even aware of such groups until this litigation.[31] Defendants also argue that Plaintiffs lack standing to challenge prayers given at meetings which they did not attend. Finally, Defendants submit that Plaintiffs lack standing because the relief they seek is unconstitutional, since it would require the Town to "become excessively entangled in church doctrine in order to determine if a prayer is sectarian or not." Def. Memo of Law at 9.

Defendants further maintain that sectarian prayer is permissible, pursuant to *Marsh*, if it is not exploited to proselytize, disparage, or advance a particular religion. (Def. Memo of Law at 14, 16). Additionally, Defendants contend that the Town's prayer practice is more inclusive than the one approved in *Marsh*, since it included clergy from many different denominations. Furthermore, Defendants state that the Town's procedure for selecting clergy is constitutional, since the lists were compiled from various sources and included various denominations, and since the persons who

---

[31]Def. Memo of Law at 7 ("How can Plaintiffs be offended at the exclusion of non-Christian prayergivers when they were not even aware that non-Christian organizations even existed within the Town?").

compiled the lists never excluded any group based on their beliefs. *Id.* at 18.

Defendants further maintain that, even assuming that the three clerks intentionally

omitted minority faiths from the prayer list, *the Town* is not liable.[32]

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking

summary judgment bears the burden of establishing that no genuine issue of material

fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he

movant must make a prima facie showing that the standard for obtaining summary

judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew

Bender 3d ed.).  "In moving for summary judgment against a party who will bear the

ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an

absence of evidence to support an essential element of the nonmoving party's claim."

*Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v.

Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that

burden has been established, the burden shifts to the non-moving party to

---

[32]Defendants' Reply Memo [#44] at 7 ("Plaintiffs claim that these clerical staff have intentionally excluded certain religious organizations from giving the prayers before the Town Board meetings.  As erroneous as these claims are factually, they are irrelevant because Plaintiffs did not sue the three clerical staff.  They sued the Town and its Supervisor.  So they must present evidence that the Town and its Supervisor had a policy, practice or custom that discriminated against different religions in the selection of prayer givers. . . .  Plaintiffs have offered no evidence that the Defendants were aware of the alleged wrongful actions of the three clerical staff, much less that such actions were adopted as Town policy.").

demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

### *Section 1983*

The relevant legal principles governing actions against a municipality under Section 1983 are well settled:

Section 1983 provides, in pertinent part:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983. In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56

L.Ed.2d 611 (1978). The fifth element-the "official policy" element-can only be satisfied where a plaintiff proves that a "municipal policy of some nature caused a constitutional tort." *Id*. at 691, 98 S.Ct. 2018. "In other words, a municipality may not be found liable simply because one of its employees committed a tort." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

The Supreme Court has made clear that "a municipality cannot be made liable" under § 1983 for acts of its employees "by application of the doctrine of respondeat superior." *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 478, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ( "[G]overnment bodies can act only through some natural persons[; therefore] governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's actions must implement rather than frustrate the government's policy." *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir.1992). Therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the alleged injury. *Brown*, 520 U.S. at 404, 117 S.Ct. 1382.

*Roe v. City of Waterbury*, 542 F.3d 31, 36 -37 (2d Cir. 2008).  In this regard,

[t]he plaintiff may establish the existence of a policy or custom in a variety of ways. Generally speaking, the courts have articulated four circumstances in which a municipality may be held liable for the unconstitutional acts of its employees. The plaintiff may establish (1) a formal policy, officially promulgated or adopted by the municipal defendant, *Monell*, 436 U.S. at 690, or (2) a specific action or decision by an official responsible for establishing final policy with respect to the subject matter, if that action or decision caused the violation of plaintiff's constitutional rights, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion), or (3) the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a "custom or usage" and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of the policy-making officials, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (1988); *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir. 1992), or (4) the failure of the City to train or supervise its employees in a fashion designed to prevent the violation of plaintiff's rights, if such failure amounts to "deliberate indifference" to the rights of

> those with whom the municipal employees will come into contact.[33]
> *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)[.]

*White-Ruiz v. City of New York*, No. 93CIV.7233(DLC)(MHD), 1996 WL 603983 at *7 (S.D.N.Y. Oct. 22, 1996) (citation omitted). "The mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (citation and internal quotation marks omitted).

The Establishment Clause of the First Amendment to the United States Constitution "prohibits the establishment of a national or state church, but the [Supreme] Court has never construed its mandate to apply only to this most obvious proscription. It has long been accepted that the Establishment Clause prohibits government from officially preferring one religious denomination over another[.]" *Skoros v. City of New York*, 437 F.3d 1, 16 (2d Cir. 2006) (citations omitted).

With these general legal principles in mind, the Court will proceed to consider the parties' various arguments.

### Official-Capacity Claims Against Auberger

As indicated above, Defendants maintain that the claims against Auberger in his

---

[33]"To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious. An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."*Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citations omitted); *see also*, *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 128 (2d Cir. 2004) ("The operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a 'conscious choice' rather than mere negligence. Thus, plaintiffs' evidence must establish only that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action or supervision was 'obvious,' and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction.") (citations omitted).

official capacity should be dismissed, since they are redundant of the claims against the Town.  The Court agrees, since "[c]laims against individual defendants in their official capacities are really claims against the municipality and, thus, are redundant when the municipality is also named as a defendant." *Zachary v.Clinton County, N.Y.*, No. 1:01CV1281 (FJS/DRH), 2003 WL 24197685 at *2 (N.D.N.Y. Jan. 10, 2003) (citation and internal quotations omitted), *aff'd*, 86 Fed. Appx. 451 (2d Cir. Jan. 21, 2004).  Accordingly, the claims against Auberger in his official capacity are dismissed.

*Standing*

Defendant maintains that Plaintiffs do not have standing, and that this Court therefore lacks subject-matter jurisdiction.  The general legal principles concerning standing are well settled.  "Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies. U.S. Const. art. III, § 2. This limitation is effectuated through the requirement of standing." *Cooper v. U.S. Postal Service*, 577 F.3d 479, 489 (2d Cir. 2009).

> The "irreducible constitutional minimum of standing," rooted in Article III's case-or-controversy requirement, consists of three elements: (1) an "injury in fact," by which is meant "an invasion of a legally protected interest"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood that "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted).  . . .  Accordingly, "standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991).

*Fulton v. Goord*, 591 F.3d 37, 41 (2d Cir. 2009) (citations omitted).  The injury alleged must be "concrete and particularized," meaning that "the injury must affect the plaintiff

in a personal and individual way." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001), *cert den*., 534 U.S. 827, 122 S.Ct. 68 (2001).

Recently, the Second Circuit observed that "there is uncertainty concerning how to apply the injury in fact requirement in the Establishment Clause context." *Cooper v. U.S. Postal Service*, 577 F.3d at 490. Generally, in the context of an Establishment Clause challenge to legislative prayer, a plaintiff may establish standing by showing that he attended a meeting where he was exposed to prayer which he found offensive. *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d at 72-74("[S]tanding to assert an Establishment Clause claim may rest . . . on the plaintiff's direct exposure to the challenged activity"). A plaintiff may also have standing by virtue of being a municipal taxpayer. *Id*. at 72-74; *Pelphrey v. Cobb County, Ga.* ("*Pelphrey*"), 547 F.3d 1263, 1280 (11th Cir. 2008) ("A municipal taxpayer has standing to challenge a violation of the Establishment Clause by a municipality when the taxpayer is a resident who can establish that tax expenditures were used for the offensive practice.") (citations omitted).

In *Cooper v. U.S. Postal Service*, the plaintiff was offended by a religious display at a contract postal unit ("CPU") operated by a church-related organization. When the plaintiff complained, the CPU operator told the plaintiff that if he was offended by the display, he could use another postal facility. *Id*., 577 F.3d at 488. The Second Circuit held that such facts were sufficient to establish standing. *Id*. at 491 ("Cooper claims that he was made uncomfortable by direct contact with religious displays that were made a part of his experience using the postal facility nearest his

home, and that upon complaint, he was advised to alter his behavior. Under *Sullivan* [*v. Syracuse Housing Auth.*, 962 F.2d 1101 (2d Cir. 1992)], these allegations state an injury in fact sufficient to support standing.").  In this case, Plaintiffs felt uncomfortable and offended by the allegedly sectarian prayers, and they contend that when they complained, Town officials told them that they could leave the meetings if they did not like the prayers.  Pursuant to *Cooper*, the Court finds that these facts suffice to establish standing.[34]

<u>Selection Procedures</u>

Plaintiffs claim as part of this action that the Town intentionally excluded "minority faiths" from delivering prayers.  The instant case presents the same issues discussed in *Pelphrey v. Cobb County, Ga.*, 448 F.Supp.2d 1357 (N.D.Ga. 2006), *affirmed*, 547 F.3d 1263 (11th Cir. 2008).  The *Pelphrey* case concerned two separate county boards, the Cobb County Board of Commissioners ("Board of Commissioners") and the Cobb County Planning Commission ("Planning Commission"), both of which had a policy of inviting clergy to deliver prayers at the start of meetings.  The plaintiffs alleged that both boards' selection procedures violated the Establishment Clause because they favored Christian churches.  With regard to the Board of Commissioners, the record indicated that the "administrative specialist" tasked with inviting clergy to deliver prayers used a variety of sources to compile a master list of potential prayer-givers. *Id*. at 1362.  The master list was made up primarily of Christian denominations,

---

[34]As discussed earlier, Defendant also contends that Plaintiffs lack standing because the relief they seek would be unconstitutional, since it would require the Court to parse the content of the prayers. The Court will address this argument as part of its analysis of Plaintiffs' claims under *Marsh* and its progeny.

with a "great diversity in [Christian] denomination and cultural affiliation." *Id*. The
administrative specialist had information concerning other "minority faiths," such as a
"Jehovah's Witness congregation and a Bahai assembly," but those organizations
were not included in the master list. *Id*. at 1362-1363. It was undisputed, though, that
the administrative specialist never took "into account the beliefs held by a religious
group in deciding whom to include on her Master List." *Id*.

The Planning Commission's selection procedure was different. In that regard,
the deputy clerk responsible for inviting clergy to deliver prayers at Planning
Commission meetings relied primarily on the telephone yellow pages, and there was
evidence that she had intentionally excluded certain faiths:

> A copy of the phonebook used by Ms. Richardson in 2003-04 shows a
> dark, straight, continuous, vertical line through the categories listed in the
> Yellow Pages surrounding "Churches." For example, Chiropractors,
> Church Furnishings, and Church Supplies & Services, and then Cigar &
> Cigarette Accessories and Circuit Board Assembly Repairs are crossed
> out. There is also a similar, somewhat lighter line drawn through a series
> of listings on the lower lefthand corner of one page in the phonebook,
> drawn continuously through Churches-Islamic, Churches-Jehovah's
> Witnesses, Churches-Jewish, and Churches-Latter Day Saints. No
> similar line is drawn through any other denomination or religious group.

*Id*. at 1363 (citations to the record omitted). The deputy clerk indicated that she did not
recall why those groups were crossed-out. *Id*. at 1363-64. Moreover, none of the
crossed-out organizations had ever been invited to deliver a prayer.

In considering whether the county's selection procedures violated the
Establishment Clause, the district court in *Pelphrey* began by reciting that section of
the Supreme Court's decision in *Marsh* which held that, "Absent proof that the
[Christian] chaplain's [sixteen-year period of] reappointment stemmed from an

impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause." *Id*. at 1370 (citation omitted).  The district court continued:

> The [Supreme] Court did not elaborate in *Marsh* on what motive or motives it would find "impermissible." Read in context, however, the "impermissible motive" prohibition seems directed at the conscious selection of a speaker from one denomination or sect for the purpose of promoting or endorsing the beliefs held by that speaker. That is, the Court appeared to deem constitutionally unacceptable the selection and retention of a particular speaker because of that speaker's sectarian affiliation or religious beliefs.
>
> The Court indicated, moreover, that the bar for proving such impermissible motive is quite high. It found the virtually uninterrupted sixteen year tenure of a single Presbyterian minister insufficient to demonstrate any "preference" for a particular faith. Instead, it appeared to envision more pronounced evidence of a legislative purpose to sanction one religious viewpoint as a necessary predicate for declaring a legislature's selection of clergy a violation of the Establishment Clause.

*Id*. at 1370-71 (citation omitted).  Nevertheless, the district court found that this high standard was met with regard to the Planning Commission's selection procedure, since it "appear[ed] . . . that certain faiths were categorically excluded from the list of prospective speakers based on the content of their faith."  *Id*. at 1373-74.  In reaching its determination, the court noted, *inter alia*, that the "minority faiths" had been crossed out. *Id*.  Consequently, the district court found that the Planning Commission's selection procedures violated the Establishment Clause.

On the other hand, the district court found no such violation as to the Board of Commissioners' selection procedures.  *Id*. at 1372-73.  In that regard, the court noted that the administrative specialist's list was "quite diverse," consisting of "denominationally and culturally heterogeneous Christian organizations," as well as non-Christian organizations.  Additionally, there was no evidence that the

administrative specialist had excluded any organization from her master list based on religious considerations. *Id*.[35]  Significantly, the district court held that the Establishment Clause was not violated merely because some so-called minority faith organizations were excluded from the Board of Commissioner's list:

> Contrary to what Plaintiffs suggest in their papers, "diversity" among the faiths represented at legislative functions has never been the *sine qua non* of constitutional legitimacy. *See Marsh*, 463 U.S. at 793-94, 103 S.Ct. 3330 (rejecting argument that sixteen year tenure of Presbyterian minister was offensive to Establishment Clause); see also Pls.' Br. in Supp. of Mot. for Summ. J. [52] at 17 n. 9 ("the current practice does not achieve the diversity required by the Court or claimed by the Defendants"). To be sure, it may lend support to a finding that a particular invocation practice has not crossed the boundaries erected by *Marsh* and (insofar as it proscribes the appearance of affiliation) *Allegheny*. But *Marsh*, as the Court reads it, was never intended to serve as a vehicle for challenging selection procedures on the basis of "disparate impact."

*Id*. at 1371.  The Eleventh Circuit affirmed. *Pelphrey*, 547 F.3d at 1281-1282.  In doing so, the circuit court observed that, "The 'impermissible motive' standard does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination." *Id.*

In the instant case, as previously discussed, Plaintiffs maintain that there are triable issues of fact that preclude summary judgment as to the constitutionality of the Town's selection procedure.  Specifically, Plaintiffs state that "whether the omissions were driven by religious animus, rather than carelessness, has been put in dispute by the Town's filings." (Pl. Reply Memo at 7).  The Court disagrees.  Based on the entire

---

[35]The district court also found the administrative specialist's explanation credible.  In that regard, although the matter was before the court on a summary judgment motion, the court considered the issue of credibility, because the parties had stipulated to having the district court resolve factual issues. *See, Pelphrey*, 547 F.3d at 1268.  There is no such stipulation in the instant case.

record in this case, there is no evidence that Sofia, Wagoner, or Fiannaca intentionally excluded non-Christians from giving prayers at Town Board meetings. Nor can any reasonable inference be drawn that Sofia, Wagoner, or Fiannacca singled-out non-Christian religious groups for such exclusion.

Plaintiffs insist that "there is credible evidence that *Sofia, Wagoner, and Fiannaca* each used multiple resources to compile the official prayergiver lists, yet consistently and purposefully excluded the minority faiths in those resources." (Pl. Reply Memo [#43] at 11) (emphasis added). That is incorrect. The record indicates that Sofia called all religious organizations listed in the version of the Community Guide that she used, which is not in evidence, and that she compiled a list of all persons who agreed to give prayers. Therefore, the fact that Sofia's list does not include certain groups does not mean that she excluded them. As for Wagoner, she used Sofia's list and probably the Community Guide as well. Wagoner indicates that she called all of the organizations on the lists that she used, and never excluded anyone based on their religion. Although there were groups listed in the Community Guide which did not give prayers during Wagoner's tenure, there is no proof that they were not asked. Moreover, the vast majority of such groups which did not give prayers were Christian. As for Fiannaca, she used the lists provided to her by Wagoner, which she updated periodically using the Greece Post, a weekly newspaper. Fiannaca randomly called groups on those lists, and never intentionally excluded any group. Moreover, Fiannaca believes that she called everyone on her list at one time or another. Although Fiannaca's cumulative lists did not include some groups that appeared in either the 2006 Community Guide, or the undated version of the Greece

Post that is contained in the record, the majority of those groups were Christian. Moreover, neither Sofia, Wagoner, or Fiannaca ever attended a Town Board meeting, and there is no evidence that any of them holds a particular religious belief.  In sum, there is no evidentiary proof in admissible form that Sofia, Wagoner, or Fiannaca intentionally excluded non-Christian faiths from offering prayers.  To the contrary, the record establishes that Sofia, Wagoner, and Fiannaca were merely attempting to complete a routine task in an efficient manner.[36]  Consequently, the Court finds that the selection procedures utilized did not violate the Establishment Clause.

Moreover, even assuming *arguendo* that Plaintiffs had established a triable of issue of fact as to whether Sofia, Wagoner, and/or Fiannaca excluded non-Christian faiths based on an impermissible motive, they have not raised a triable issue of fact as to municipal liability.  Plaintiffs have not identified any formal policy of the Town to exclude non-Christians from delivering prayers.  Nor have Plaintiffs identified a specific action in that regard by a policy-making official.  Nor have Plaintiffs alleged or shown that the Town was deliberately indifferent with regard to training or supervising Sofia, Wagoner, or Fiannacca.  Consequently, it appears that Plaintiffs' method of establishing municipal liability would be to show "the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a "custom or usage" and proof that this practice was so manifest or widespread as to imply the

---

[36]Plaintiffs imply that Christianity is a single faith. *See*, e.g., Plaintiff's Opposition Memo [#38] at 15; *see also*, *id*. at 21 (referring to Christianity as "the Town's preferred faith."). However, while all Christian denominations share a common heritage, they are hardly homogeneous.  As the Court in *Pelphrey* recognized, the various Christian organizations are "denominationally and culturally heterogeneous."  It is therefore clear that Sofia, Wagoner, and Fiannaca extended invitations to a broad spectrum of religious organizations.

constructive acquiescence of the policy-making officials."[37] *See, City of St. Louis v. Praprotnik*, 485 U.S. at 127, 130 , and *Sorlucco v. New York City Police Dept.*, 971 F.2d at 871.  However, Plaintiffs' papers do not expressly discuss or address how the Town is liable for the actions of the clerks, and do not allege a policy, practice, or custom, except in conclusory terms.

Moreover, in order to "constructively acquiesce" to a subordinate's unconstitutional conduct, senior policy-making officials must be aware of the conduct, and consciously choose to ignore it: "Another method of implicating a policymaking official through subordinates' conduct is to show that the policymaker *was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them*, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d at 126 (emphasis added, citation omitted); *Rubio v. County of Suffolk*, 328 Fed.Appx. 36, 38, 2009 WL 1372001 at *1 (2d Cir. May 18, 2009) ("Although in some cases a supervisor's acquiescence to actions of his subordinates may amount to a 'custom' or 'policy,' in such a case *the subordinates' discriminatory practice must be so manifest* as to imply the constructive acquiescence  of senior policy-making officials.") (emphasis added); *Sorlucco v. New York City Police Dept.*, 971 F.2d at 871 ("[B]efore the actions of subordinate city employees can give rise to § 1983 liability, *their discriminatory practice must be so manifest* as to imply the constructive acquiescence of senior policy-making officials.") (emphasis added); *Jeffes v. Barnes*, 208 F.3d 49, 61

---

[37]To be clear, the relevant "policy, practice or custom" that Plaintiffs must show is a policy, practice, or custom of excluding "minority faiths" from the lists of potential clergy. *See*, Plaintiff's Memo in Opposition [#38] at 6 ("[T]he Town drew its prayergiver lists from public sources (the Greece Post, the Chamber of Commerce directory, and . . . the Yellow Pages), all of which included minority faiths that the Town has systematically excluded or declined to invite.")

(2d Cir. 2000) ("[A] municipal policymaker may be found to have caused subordinate officials' conduct by reason of the policymaker's acquiescence in a longstanding [unconstitutional] practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.") (citation omitted).

In this case, there is no evidence that policymaking Town officials were aware that non-Christian groups were allegedly being excluded. Although Plaintiffs insist that the Town of Greece is "a religiously diverse community,"[38] they were not personally aware of any non-Christian religious groups in the Town of Greece.[39] Moreover, even if various Town officials were aware of non-Christian religious groups, that does not mean that they were aware that Sofia, Wagoner, and Fiannaca were allegedly excluding them from giving prayers. In fact, there is no evidence of such an awareness by Town officials.

Alternatively, Plaintiffs contend that the Town received notice of the alleged "systematic exclusion" when Plaintiffs complained to Town officials. However, when Galloway and Stephens met with Town officials to complain about the prayer practice, they complained about prayer at meetings generally, and more specifically, about the sectarian nature of the prayers. Galloway Dep. at 49-50; Stephens Dep. at 52;

---

[38]Pl. Memo [#32-1] at 19.

[39]In March 2007, the local chapter of the ACLU wrote to the Town's attorney, complaining about the sectarian nature of the prayers. The attorney also suggested that the Town "invite nonChristian [sic] ministers," and conceded that, "*You may have to reach outside the town of Greece to find some of these ministers.*" Plaintiff's Appendix, Tab 20, Forsyth letter (emphasis added). In response, the Town's attorney indicated, *inter alia*, that the Town's selection process involved organizations "within the faith community of the Town of Greece." *Id.* The Court is aware of no authority that would require the Town to invite clergy from other towns to diversify the prayers delivered at Greece Town Board meetings.

Galloway Decl. dated Jan. 16, 2009, ¶ 15.[40]  There is no indication that Plaintiffs

complained that non-Christian religions were being excluded from delivering prayers.

*See, id.*; *see also*, Firkins Dep. at 259-260 (Plaintiffs complained about prayer at Board

meetings); McCann Dep. at 27-28 (Plaintiffs complained about prayer generally at

Board meetings).  Nevertheless, shortly after that meeting, news of Plaintiffs'

complaints caused individuals from minority faiths to volunteer to give prayers, and the

Town permitted them to do so.[41]

Since Plaintiffs have not come forward with evidence that the Town excluded

non-Christians for impermissible reasons, the Town is entitled to summary judgment

on Plaintiffs' claim that the Town's selection procedures violated the Establishment

Clause.

### Sectarian Nature of the Prayers

Plaintiffs maintain that the Town violated the Establishment Clause by

permitting individuals to deliver "sectarian" prayers at Board Meetings.  Plaintiffs state,

in that regard, that, pursuant to *Marsh* and *Allegheny*, sectarian legislative prayers

violate the Establishment Clause *per se*, since they necessarily exploit the prayer

opportunity and affiliate the government with a specific faith.   Plaintiffs contend that

---

[40]Similarly, the letters sent to the Town by the ACLU and Plaintiffs' counsel in March 2007 and July 2007, respectively, complained primarily about the sectarian nature of the prayers, and did not allege that the Town was intentionally excluding non-Christians from giving prayers. Plaintiff's Appendix, Tab 20, Exhibits 71, 72, 75.

[41]Plaintiffs met with McCann and Firkins on September 24, 2007.  Significantly, at that meeting McCann and/or Firkins told Plaintiffs that anyone, including Atheists, was welcome to give prayers.  On January 15, 2008 and July 15, 2008, Chikowsky, a Jewish layman, delivered prayers.  On April 15, 2008, Zarpentine, a Wiccan priestess, delivered a prayer.  And on December 16, 2008, Thomas Lynch, a member of the Bahai Faith Assembly, delivered a prayer.

the Town must instruct potential prayer-givers that prayers must be inclusive and non-sectarian.  Defendants, on the other hand, contend that courts have no reason to parse the content of prayers, unless it has been shown that the legislative prayers were exploited to proselytize or disparage another faith.  Defendants further state that there was no such exploitation in this case.

Any analysis of the constitutionality of legislative prayer necessarily begins with the Supreme Court's decision in *Marsh*, which involved a challenge to the Nebraska state legislature's practice of having the same Presbyterian minister, Reverend Palmer ("Palmer"), deliver prayers "in the Judeo-Christian tradition" at the start of each legislative session over a period of sixteen years. *Marsh*, 103 S.Ct. at 3337.  The Court reviewed the long "unique history" of legislative prayer in the United States, and particularly in the United States Congress, and concluded that in general, legislative prayer "presents no more potential for establishment than the provision of school transportation, beneficial grants for higher education, or tax exemptions for religious organizations." *Id*. at 3335-36 (citations omitted).  In that regard, the Court wrote:

> The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom.
>
> ***
>
> [T]he First Congress, as one of  its early items of business, adopted the policy of selecting a chaplain to open each session with prayer.
>
> ***
>
> On Sept. 25, 1789, three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights, J. of the Sen. 88; J. of the H.R. 121. Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has

continued without interruption ever since that early session of Congress. It has also been followed consistently in most of the states, including Nebraska[.]

***

Standing alone, historical patterns cannot justify contemporary violations of constitutional guarantees, but there is far more here than simply historical patterns. In this context, historical evidence sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied to the practice authorized by the First Congress-their actions reveal their intent. An act "passed by the first Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, ... is contemporaneous and weighty evidence of its true meaning". *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 297, 8 S.Ct. 1370, 1377, 32 L.Ed. 239 (1888).

***

In applying the First Amendment to the states through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), it would be incongruous to interpret that clause as imposing more stringent First Amendment limits on the States than the draftsmen imposed on the Federal Government.

This unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged.

*Id*. at 3333-35 (footnotes omitted).  The Court further stated:

In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of *beliefs* widely held among the people of this country.  As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952).

*Id*. at 3336 (emphasis added).[42]  Consequently, it is clear that legislative prayer does

---

[42]In making this determination, the court did not apply the test ordinarily used in Establishment Clause cases, set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105 (1971) ("*Lemon*").  In that regard, it seems clear that legislative prayer would not pass the *Lemon* test.

not, in and of itself, violate the Establishment Clause.

The Supreme Court in *Marsh* then turned its attention to whether "any [particular] features of the Nebraska practice" violated the Establishment Clause. Specifically, the court looked at three points: "first, that a clergyman of only one denomination-Presbyterian-has been selected for 16 years; second, that the chaplain is paid at public expense; and third, that the prayers are in the Judeo-Christian tradition." *Id*. at 3336-37. The Court found that, "[w]eighed against the historical background, these factors do not serve to invalidate Nebraska's practice." *Id*. at 3337. Significantly, in describing the prayers as being "in the Judeo-Christian tradition," the court included a footnote, stating: "Palmer [the chaplain] characterizes his prayers as "nonsectarian," "Judeo Christian," and with "elements of the American civil religion." Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980[43] complaint from a Jewish legislator." *Id*. at 3337, n. 14. However, the Court did not indicate that Palmer's prayers were constitutional because they omitted all references to Christ. Nor did the majority indicate that it agreed with Palmer's characterization of his prayers as "nonsectarian." [44] Instead, the

---

[43]Palmer was hired as chaplain in 1965, therefore it appears that as of 1980, he had been delivering explicity Christian prayers in the Nebraska legislature over a period of fifteen years, before someone complained and he removed references to Christ. In other words, Palmer delivered explicitly Christian prayers during fifteen of the sixteen years that were at issue in the case. The Supreme Court did not seem concerned about that fact in reaching its conclusion that Palmer's prayers did not violate the Establishment Clause.

[44]Justice Brennan in his dissenting opinion indicated only that Palmer's prayers were "relatively 'non-sectarian' in comparison with some other examples," while Justice Stevens, also dissenting, referred to the "clearly sectarian content of some of" Palmer's prayers, one of which he set forth verbatim in his opinion. *Id*. at 3350, n. 38, 3352, n.2. Therefore, to this Court there appears to be little factual support for the notion, discussed below, that in *Marsh*, the challenged prayers were upheld because they were nonsectarian. To the contrary, the *Marsh* decision indicates that the prayers were largely sectarian.

Court stated:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id*. at 3337-38. Significantly in this regard, the Court found that Palmer had not exploited, proselytized, or advanced any one faith, even though, as noted in footnote 40 of this Decision and Order, he had delivered "prayers [that] were often explicitly Christian" over a period of fifteen years. *Id*. at 3337, n. 14.

Six years later, in *Allegheny*, the Supreme Court considered a challenge by the ACLU to the constitutionality of two holiday displays, consisting of a Christian creche and a Jewish menorah, respectively, located on government property. The Court summarized its Establishment Clause holdings as follows:

> In the course of adjudicating specific cases, this Court has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs. Although the myriad, subtle ways in which Establishment Clause values can be eroded are not susceptible to a single verbal formulation, this Court has attempted to encapsulate the essential precepts of the Establishment Clause. Thus, in *Everson v. Board of Education of Ewing*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court gave this often-repeated summary:

> "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can

be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." *Id.*, at 15-16, 67 S.Ct., at 511-512.

*Allegheny*, 492 U.S. at 591, 109 S.Ct. at 3099-3100 (citations and internal quotation marks omitted); *see also, id.*, 109 S.Ct. at 3101 ("Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from making adherence to a religion relevant in any way to a person's standing in the political community.") (citation and internal quotation marks omitted); *id.* at 3105 ("[T]he Establishment Clause does not limit only the religious content of the government's own communications. It also prohibits the government's support and promotion of religious communications by religious organizations.").

The Court in *Allegheny* determined that the creche display violated the Establishment Clause, and that the menorah did not.[45] In that regard, the Court found that the creche "endorse[d] Christian doctrine." *Id.* at 3105. On the other hand, the Court found that the menorah display did not violate the Establishment Clause, even though the menorah is a sectarian religious symbol, because it was displayed along with a Christmas tree and a sign saluting "liberty." *Id.* at 3113-16 (plurality) (Stating that

---

[45]Based on the specific facts presented, the court found that the creche display amounted to an endorsement of the Christian faith, while the menorah was "not an endorsement of religious faith but simply a recognition of cultural diversity." *Allegheny*, 109 S.Ct. at 3115.

"[t]he Christmas tree, unlike the menorah, is not itself a religious symbol.").[46]

As part of the majority's explanation, the Court discussed the dissenting opinion of Justice Kennedy, who argued that the creche display was acceptable, pursuant to *Marsh*. In rejecting that argument, the *Allegheny* majority stated, in pertinent part:

> Indeed, in *Marsh* itself, the Court recognized that not even the "unique history" of legislative prayer, 463 U.S., at 791, 103 S.Ct., at 3336, can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. *Id.*, at 794-795, 103 S.Ct., at 3337-3338. The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had "removed all references to Christ." *Id.*, at 793, n. 14, 103 S.Ct., at 3337, n. 14. Thus, *Marsh* plainly does not stand for the sweeping proposition Justice KENNEDY apparently would ascribe to it, namely, that all accepted practices 200 years old and their equivalents are constitutional today.

*Id.*, 109 S.Ct. at 3106.[47] This statement from *Allegheny* is the primary support for Plaintiffs' contention that all legislative prayer must be non-sectarian.

Subsequently, the Supreme Court conducted another Establishment Clause analysis, in *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649 (1992) ("*Lee*"). In pertinent part, *Lee* involved a public middle school graduation ceremony, at which a clergyman delivered an invocation prayer. Prior to the graduation, the school principal gave the invited rabbi "a pamphlet entitled 'Guidelines for Civic Occasions,' prepared by the

---

[46]In her concurring opinion, Justice O'Connor agreed that the menorah display did not violate the Establishment Clause, even though it is a "religious and indeed sectarian" symbol. *Id*. at 3123. Justice O'Connor stated that a viewer would not view the menorah, alongside the Christmas tree and sign celebrating liberty, as endorsing religion: "Although the religious and indeed sectarian significance of the menorah is not neutralized by the setting, this particular physical setting changes what viewers may fairly understand to be the purpose of the display – as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content." *Id*. (citations and internal quotation marks omitted).

[47]The *Allegheny* decision itself is based on the majority's application of *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355 (1984), not *Marsh*. *See, e.g., Allegheny*, 109 S.Ct. at 3117 (Justice O'Connor concurring opinion) ("The constitutionality of the two displays . . . turns on how we interpret and apply the holding in *Lynch v. Donnelly* . . . .").

National Conference of Christians and Jews, which "recommended that public prayers at nonsectarian civic ceremonies by composed with 'inclusiveness and sensitivity.'" *Id*., 112 S.Ct. at 2652. Additionally, the school principal told the rabbi that "the invocation and benediction should be nonsectarian." *Id*. The Court found that the principal's attempt to instruct the rabbi on the content of his prayer was improper, stating that, "[t]hrough these means the principal directed and controlled the content of the prayers." *Id*. at 2656. The Court further stated:

> It is a cornerstone principle of our Establishment Clause jurisprudence that "it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government," *Engel v. Vitale*, 370 U.S. 421, 425, 82 S.Ct. 1261, 1264, 8 L.Ed.2d 601 (1962), and that is what the school officials attempted to do.
>
> ***
>
> We are asked to recognize the existence of a practice of nonsectarian prayer, prayer within the embrace of what is known as the Judeo-Christian tradition, prayer which is more acceptable than one which, for example, makes explicit references to the God of Israel, or to Jesus Christ, or to a patron saint. . . . If common ground can be defined which permits once conflicting faiths to express the shared conviction that there is an ethic and a morality which transcend human invention, the sense of community and purpose sought by all decent societies might be advanced. But though the First Amendment does not allow the government to stifle prayers which aspire to these ends, neither does it permit the government to undertake that task for itself.
>
> ***
>
> Though the efforts of the school officials in this case to find common ground appear to have been a good-faith attempt to recognize the common aspects of religions and not the divisive ones, our precedents do not permit school officials to assist in composing prayers as an incident to a formal exercise for their students. *Engel v. Vitale, supra*, 370 U.S., at 425, 82 S.Ct., at 1264. And these same precedents caution us to measure the idea of a civic religion against the central meaning of the Religion Clauses of the First Amendment, which is that all creeds must be tolerated and none favored. The suggestion that government may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a

contradiction that cannot be accepted.

*Id*. at 2656-57; *see also, id*. at 2658 ("A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed.").  Additionally, the Court held that the school's practice of including prayer at graduation was coercive and unconstitutional.  In that regard, the Court explained that its determination was not inconsistent with *Marsh*:

> Inherent differences between the public school system and a session of a state legislature distinguish this case from *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). . . .  The atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend. The influence and force of a formal exercise in a school graduation are far greater than the prayer exercise we condoned in *Marsh*.

*Id*. at 2660.

The foregoing Supreme Court cases establish several principles.  First, legislative prayer is acceptable in general, provided that the prayer opportunity is not exploited to proselytize or advance any one, or to disparage any other, faith or belief. Second, unless the prayer opportunity has been so exploited, courts should not "parse" the content of a particular prayer.  Third, prayers in the Judeo-Christian tradition are acceptable, although legislative prayers that have the effect of affiliating the government with any one specific faith or belief are improper.  Finally, the government may not compose official prayers or dictate the content of prayers.

Since *Marsh* was decided, several circuit courts and district courts have issued opinions concerning legislative prayer.  A number of these cases have specifically

considered whether legislative prayer must be nonsectarian.

In *Stein v. Plainwell Community Schs.*, 822 F.2d 1406 (6th Cir. 1987) ("Stein"), the Sixth Circuit considered the constitutionality of invocational prayers at high school commencement exercises. As part of its, discussion, the court referred to *Marsh*, as follows:

> In *Marsh v. Chambers*, the Supreme Court, looking primarily to the intent of the framers of the Constitution and historical practice since 1789, id. at 786-792, 103 S.Ct. at 3333-36, upheld "nonsectarian," id. at 793 n. 14, 103 S.Ct. at 3337 n. 14 "nonproselytizing" legislative invocations that do not "symbolically place the government's official seal of approval on one religious view," id. at 792, 103 S.Ct. at 3336 (citation omitted). The Court emphasized that "civil" or secularized invocations are used across the country to open legislative, judicial, and administrative sessions of state legislatures, city councils, courts and other public bodies, as well as by private institutions of all kinds. So long as the invocation or benediction on these public occasions does not go beyond "the American civil religion," so long as it preserves the substance of the principle of equal liberty of conscience, no violation of the Establishment Clause occurs under the reasoning of Marsh. Id. at 793, n. 14, 103 S.Ct. at 3337 n. 14.

*Id*. at 1408-1409. Respectfully, though, this description of *Marsh* does not appear to be entirely accurate, as shown by the discussion above and by a review of the *Marsh* decision itself. Most notably, the *Marsh* court did not indicate that legislative invocations had to be nonsectarian. Nor did the court state that invocations must "not go beyond 'the American civil religion.'" To the contrary, the only reference to American civil religion in the *Marsh* decision is in a footnote, setting forth Palmer's own description of his prayers, not the Court's. Nor did the Court in *Marsh* refer to legislative prayers as being "civil or secularized invocations."

In *Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir. 1998), *cert den*. 526 U.S. 1039 (1999), the Tenth Circuit upheld a city council's decision to prevent a private

citizen from offering a "prayer" at a meeting, where the "prayer" was really a sarcastic commentary directed against legislative prayer.[48]   In pertinent part, the Tenth Circuit stated that under *Marsh*,

> the kind of legislative prayer that will run afoul of the Constitution is one that proselytizes a particular religious tenet or belief, or that aggressively advocates a specific religious creed, or that derogates another religious faith or doctrine. When a legislative invocation strays across this line of proselytization or disparagement, the Establishment Clause condemns it.

*Id.*, 159 F.3d at 1234.  In that regard, the court further explained:

> Of course, all prayers "advance" a particular faith or belief in one way or another. The act of praying to a supreme power assumes the existence of that supreme power. Nevertheless, the context of the decision in *Marsh*-in which the Court considered the constitutionality of a Presbyterian minister's "Judeo Christian," "nonsectarian" invocations for the Nebraska Legislature-underscores the conclusion that *the mere fact a prayer evokes a particular concept of God is not enough to run afoul of the Establishment Clause.  Rather, what is prohibited by the clause is a more aggressive form of advancement, i.e., proselytization. See Marsh*, 463 U.S. at 793 n. 14, 794-95, 103 S.Ct. 3330. By using the term "proselytize," the Court indicated that the real danger in this area is effort by the government to convert citizens to particular sectarian views. *See* Websters Third New International Dictionary (Unabridged) 1826 (1986) (defining "proselytize" as "to convert from one religion, belief, opinion, or party to another"). As the Court reiterated in *Lee*, "[I]n the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce. A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." *Lee*, 505 U.S. at 591-92, 112 S.Ct. 2649.

*Id.*, n. 10 (emphasis added).  The circuit court noted that legislative prayer may "often" contain Judeo-Christian references:

> The genre approved in *Marsh* is a kind of ecumenical activity that seeks

---

[48]The Tenth Circuit assumed without deciding that the appellant's "prayer" was "an invocational prayer," while noting that the "supposed prayer can perhaps as easily be characterized as political harangue." *Id.* at 1229.

to bind peoples of varying faiths together in a common purpose. That genre, *although often taking the form of invocations that reflect a Judeo-Christian ethic*, typically involves nonsectarian requests for wisdom and solemnity, as well as calls for divine blessing on the work of the legislative body.

*Id.* at 1234 (emphasis added). The Tenth Circuit held that the city council had properly rejected the appellant's request, since his proposed prayer "aggressively proselytizes for his particular religious views and strongly disparages other religious views." *Id.* at 1235 ("Snyder's claim must fail as a matter of law because his proposed prayer falls well outside the genre of legislative prayers that the Supreme Court approved in *Marsh*[.] . . . Snyder's prayer aggressively proselytizes for his particular religious views and strongly disparages other religious views.").

In *Bacus v. Palo Verde Unified Sch. Dist. Bd. of Educ.*, No. 99-57020, 52 Fed.Appx. 355, 2002 WL 31724273 (9th Cir. Dec. 3, 2002) ("*Bacus*"), the Ninth Circuit considered the constitutionality of a school board's practice of beginning public meetings with prayer. The "same individual almost always offered the invocation, always 'in the name of Jesus,' and no individuals of other religions ever gave the invocation." *Id.*, 2002 WL 31724273 at *1.[49] The court found that such prayers "did not disparage other religious faiths, and did not proselytize." *Id.* Nevertheless, the court found that such prayers violated the Establishment Clause, purportedly because they "advanced one faith, Christianity, providing it with a special endorsed and privileged status in the school board." *Id.*

---

[49]The Ninth Circuit specifically did not address the precise issue before this Court. *Id.* ("[W]e need not decide whether prayers 'in the Name of Jesus' would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects, and denominations." (citation omitted).

In *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292 (4th Cir. 2004) ("*Wynne*"), the Fourth Circuit considered the constitutionality of a town council's practice of beginning monthly meetings with prayer: Where a member of the council, and often the same member, led the prayer; where the Mayor and council members were all Christians; and where the prayers "'frequently refer[red] to Jesus, Jesus Christ, Christ or Savior." *Id.*, 376 F.3d at 294. The court discussed *Marsh* and *Allegheny*, and stated, in pertinent part, "that while *Marsh* may have found that history can affect the constitutionality of *nonsectarian* references to religion by the government, the Court [did not hold] that history can legitimate practices that demonstrate the government's allegiance to a particular sect or creed." *Id.* at 297 (emphasis in original, citation omitted). The court found that under the facts described above, the town council had "improperly 'exploited' a prayer opportunity to advance one religion over others." *Id.* at 298. On this point, the court further stated:

> The prayers challenged here stand in sharp contrast to the prayer held not to constitute an establishment of religion in *Marsh*. In *Marsh*, the approved prayer was characterized as 'nonsectarian' and 'civil'; indeed the chaplain had affirmatively 'removed all references to Christ." *Marsh*, 463 U.S. at 793 n. 14, 103 S.Ct. 3330.[50] Here, on the other hand, the prayers sponsored by the Town Council 'frequently' contained references to 'Jesus Christ,' and thus promoted one religion over all others[.]

*Id.* at 298.[51]

---

[50]As discussed above, the chaplain in *Marsh* removed references to Christ during the final year of the sixteen-year period at issue in that case.

[51]As part of its discussion, the court rejected that portion of the *Snyder* decision which held that since "all prayers advance a particular faith or belief in one way or another, *Marsh* must have prohibited only the more aggressive form of advancement, i.e., proselytization," stating that the Tenth Circuit's "premise and conclusion are wrong." *Id.* at 301, n.6 (citation omitted). In that regard, the Fourth Circuit stated that non-sectarian Judeo-Christian prayers "do *not* advance a *particular* sect or faith." *Id.* (emphasis in original).

The Fourth Circuit again considered a challenge to legislative prayer in *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276 (4th Cir. 2005) ("*Simpson*"). In *Simpson*, a county board of supervisors adopted a policy that "invocation[s] must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief." *Id*., 404 F.3d at 278. The county invited leaders of various religions to offer such nonsectarian prayers, and in that regard, the court stated:

> This diversity reflects the Board's requirement that prayers be 'non-sectarian.' . . . As to the effect and/or impact of the invocations, they are brief, benign pronouncement of simple values that are not controversial nor confrontational but for, at most, mention of specific Judeo-Christian references that are nevertheless clearly recognized as symbols of the universal values intended to be conveyed. The County, seeking to avoid the slightest hint of sectarianism, revised its invitation letter to the clergy. The letter now directs clerics to avoid invoking the name of Jesus Christ, a custom to which Christian clergy often had adhered when closing their invocations in the past.

*Id*. at 279 (citation and internal quotation marks omitted). The plaintiff-appellant, Simpson, a self-described witch, alleged that the county's policy violated the Establishment Clause. The basis of her complaint was that she asked to be added to the list of invited clergy, but the county denied her request to be added to the list of clergy, telling her that invocations were limited those "traditionally made to a divinity that is consistent with the Judeo-Christian tradition." *Id*. at 280. The court summarized *Marsh* as standing for the idea that "non-sectarian legislative prayer generally does not violate the Establishment Clause." *Id*. at 282 (citation omitted). Purportedly applying that principle, the court stated that the use of the name Christ was improper, but that the following terms were permissible: "Lord God, our creator"; "giver and sustainer of

life"; "the God of Abraham, Isaac and Jacob"; "Heavenly Father"; "Lord our Governor"; and "Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator." *Id*. at 284.

In *Hinrichs v. Bosma*, 440 F.3d 393 (7th Cir. 2006) ("*Hinrichs*"), the Seventh Circuit considered an Establishment Clause challenge to the Indiana House of Representative's "practice of opening its proceedings with overtly sectarian prayer, usually Christian." *Id*., 440 F.3d at 394.[52]  The appellant was seeking a stay, pending appeal, of a district court's ruling, which found that the aforementioned policy was unconstitutional, and which permanently enjoined such prayer. *See, id*. at 402 ("The injunction permits prayer so long as it is of a nondenominational nature and does not use Christ's name or title or any other denominational appeal.") (citation omitted).  The court began by indicating that *Marsh*, and the cases applying *Marsh*, generally approved only nonsectarian legislative prayer.  *Id*. at 399 (*citing, inter alia, Allegheny*); *see also, id*. at 401 ("These cases appear to teach the rule that non-sectarian legislative prayer is constitutionally sound, but sectarian appeals, including those of an overtly Christian nature, are not.") (citations omitted).   In that regard, the court rejected the idea that "prohibiting clerics from invoking Christ would violate the Free Exercise or Free Speech Clauses of the First Amendment." *Id*. at 402.  Consequently, the majority agreed with the district court and denied the stay. *Id*. at 403.  One justice dissented, stating that, "[w]hile there is caselaw supporting the proposition that *Marsh* approves of only nonsectarian legislative prayer, there still remain powerful arguments to the

---

[52]Invited clergy were asked to "strive for an ecumenical prayer." *Id*. at 395.

contrary, not the least of which is the *Marsh* majority's curious ambiguity on the point."
*Id.* at 403. Subsequently, the Seventh Circuit reversed its decision, reversed the district court, and remanded the case with instructions to dismiss for lack of subject matter jurisdiction.[53]

In *Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188 (5th Cir. 2006), the Fifth Circuit was faced with an Establishment Clause challenge to a school board's practice of beginning its meetings with prayer. Prayers were offered by board members, school administrators, teachers, students, and clergy, and the sample prayers in the record each "contained a reference to 'Jesus Christ' or 'God' and 'Lord.'" *Id.*, 473 F.3d at 192. The district court permanently enjoined the school board from opening its meetings with *any* prayer. *Id.*, 473 F.3d at 193. On appeal, two circuit court panel members found the aforementioned prayer policy unconstitutional and affirmed the injunction in part, though for different reasons, and the third member voted to find that the prayer policy did not violate *Marsh*. More specifically, Judge Barksdale found that the prayers violated *Marsh*[54] because they were sectarian, and therefore advanced Christianity. *See, id.* at 203, n. 2 ("[T]he impermissible advancement of a particular religion is grounded in the Board's refusal to adopt a nonsectarian policy, the prayers' uniformly

---

[53]*Hinrichs v. Speaker of House of Reps. of Indiana General Assembly*, 506 F.3d 584, 585 (7th Cir. 2007) ("We denied the stay but noted that our decision was based only on a preliminary understanding of the facts surrounding Indiana's practice. *Hinrichs v. Bosma*, 440 F.3d 393 (7th Cir.2006) ("*Hinrichs II*"). After briefing, oral argument and supplemental briefing, we now hold that the plaintiffs do not have standing to maintain this action.").

[54]Judge Barksdale indicated that, "The challenged prayers in *Marsh* contained no references to Jesus Christ; although the chaplain had made Christian references in the past, they had been removed at the request of a non-Christian legislator." *Id.*, 473 F.3d at 1989. However, as discussed above, the prayers at issue in *Marsh* spanned a period of sixteen years, and during most of that time the prayers contained references to Jesus Christ.

Christian tenor, and their overtly sectarian, proselytizing references.").  Judge
Barksdale further faulted the school board for selecting only prayer-givers "who would
advance the Christian faith" and for not adopting a non-sectarian prayer policy after the
lawsuit was filed. *Id*. at 204.  In a concurring opinion, Judge Stewart voted to uphold
the injunction, finding that the prayer policy was unconstitutional under *Lemon*.  Finally,
Judge Clement filed a dissenting opinion, finding that the challenged policy did not
violate *Marsh*, since the plaintiff-appellee "failed to demonstrate that the Board
exploited the prayer opportunity either to proselytize or advance any one, or to
disparage any other, faith or belief." *Id*. at 211 (citation and internal quotation marks
omitted).  On this point, Judge Clement observed:

> If content is determinative, the *Marsh* Court's analysis would be internally
> conflicted. The content of congressional prayer, referred to by the *Marsh*
> Court as exemplifying permissible legislative prayer, traditionally has
> included sectarian references. In addition, Congress continues to permit
> sectarian invocations, as it has since the practice's inception. FN 1  This
> practice, which Judge Barksdale's opinion would deem unconstitutional
> under *Marsh*, has been upheld by the D.C. Circuit. *See  Murray v.
> Buchanan*, 720 F.2d 689, 690 (D.C.Cir.1983) (en banc) (per curiam); see
> also  *Newdow v. Eagen*, 309 F.Supp.2d 29, 41 (D.D.C.2004) (holding
> that congressional prayer remains constitutional under *Marsh*).

>> FN1. There is no doubt that prayers before Congress often contain
>> explicit sectarian references. *See Newdow v. Bush*, 355
>> F.Supp.2d 265, 285 n. 23 (D.D.C.2005) (noting that "the legislative
>> prayers at the U.S. Congress are overtly sectarian"); *see also*
>> Steven B. Epstein, Rethinking the Constitutionality of Ceremonial
>> Deism, 96 Colum. L.Rev. 2083, 2104 & n. 118 (1996) (noting that,
>> in the six-year period before 1996, "over two hundred and fifty
>> opening prayers delivered by congressional chaplains have
>> included supplications to Jesus Christ").

> By relying on congressional prayer as a demonstrative example, the
> *Marsh* Court endorsed the understanding that the sectarian nature of the
> prayer's content does not render it necessarily constitutionally unsound.

> *Marsh*, 463 U.S. at 794-95, 103 S.Ct. 3330; *see also McCreary County*, 125 S.Ct. at 2733 n. 10 (citing *Marsh* as an example of a permissible prayer whose "manifest purpose was presumably religious"). Indeed, the Court stated that the Founders "did not consider opening prayers as a proselytizing activity or as symbolically placing the government's official seal of approval on one religious view." *Marsh*, 463 U.S. at 792, 103 S.Ct. 3330 (internal quotation omitted). The content of the prayers identified in the stipulations [in this case] does not vary meaningfully from that of the prayers offered in Congress on a day-to-day basis.

*Id*. at 212-213.   Judge Clement further found that the plaintiff had not offered proof that the school board had excluded non-Christian faiths from participating in prayers. *Id*. at 215.   In that regard, Judge Clement noted that the school board had indicated its "willingness to allow any viewpoint to be heard at the meetings." *Id*.

In any event, following a rehearing *en banc*, the Fifth Circuit reversed its earlier decision, vacated the district court's judgment, and remanded the case with instructions to dismiss it for lack of standing. *Doe v. Tangipahoa Parish Sch. Bd.*, 494 F.3d 494 (5th Cir. 2007) (en banc).   The school board then adopted a new prayer policy, authorizing the board "to invite and host a rotating roster of Parish clergy to deliver prayers."[55]   The board also drafted a form letter to use when inviting clergy, which stated, in relevant part: "To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocation speaker, nor to disparage any faith or belief different than that of the invocation speaker."[56]   The policy did not expressly prohibit sectarian prayer or recommend that clergy refrain from using sectarian

---

[55]*Doe v. Tangipahoa Parish Sch. Bd.*, 631 F.Supp.2d 823, 826 (E.D. La. 2009).

[56]*Id*. at 828.

language.  Following the adoption of this policy, a number of invited clergy offered

prayers that contained references to Jesus Christ.[57]  Subsequently, the Doe Plaintiff re-

filed his lawsuit, and established his standing to challenge the school board's policy.  In

*Doe v. Tangipahoa Parish Sch. Bd.*, 631 F.Supp.2d 823 (E.D. La. 2009) ("Doe II"), the

district court considered cross-motions for summary judgment on the Establishment

Clause claims.  The district court set forth its interpretation of *Marsh*, in pertinent part,

as follows:

> Fidelity to *Marsh* commands not a content-based approach, or an inquiry
> into whether prayers are sectarian or nonsectarian at the outset, but,
> rather, focuses on exploitation of the prayer opportunity and efforts, direct
> or not, to proselytize; to promote or sell a religion. The Supreme Court in
> *Marsh* discussed the tenure of the hired chaplain and held "[a]bsent proof
> that the chaplain's reappointment stemmed from an impermissible
> motive, ... long tenure does not in itself conflict with the Establishment
> Clause." *Marsh*, 463 U.S. at 793-94, 103 S.Ct. 3330. Noting that the
> prayers were offered in the Judeo-Christian tradition, the Supreme Court
> refused to examine their content because: ["]The content of the prayer is
> not of concern to judges where, as here, there is no indication that the
> prayer opportunity has been exploited to proselytize or advance any one,
> or to disparage any other, faith or belief. That being so, it is not for us to
> embark on a sensitive evaluation or to parse the content of a particular
> prayer.["] *Marsh*, 463 U.S. at 794-95, 103 S.Ct. 3330. In other words, in
> light of the historical background of legislative prayer, *Marsh* teaches us
> that sectarian references do not inherently violate the Establishment
> Clause; rather, important factors inform the constitutionality of legislative
> prayer practice: the identity of the speaker, the selection of the speaker,
> the method and process of selection, and the nature of the prayers.

*Id*. at 839-840 (citations omitted).  Nevertheless, the district court found that there were

triable issues of fact as to whether the school board had exploited the prayer

opportunity to advance Christianity. *Id*. at 840.  For example, there was some evidence

suggesting that the person responsible for inviting clergy had favored Christian clergy

---

[57]*Id*. at 829, n. 6.

over non-Christian clergy, as well as some evidence that board members viewed the invocations as being limited to Christian prayer. *Id*.

In *Turner v. City Council of the City of Fredericksburg, Virginia*, 534 F.3d 352 (4th Cir. Jul. 23, 2008), *cert den.*, 129 S.Ct. 909 (2009), the Fourth Circuit addressed a challenge to a city council's policy "requiring that legislative prayers be nondenominational." *Id*., 534 F.3d a 353.  In that case, the council's prayers were offered only by elected council members, on a rotating basis. *Id*.  The plaintiff-appellant, Turner, a minister and elected member of the council, argued that the council's policy violated his First Amendment rights, because his "religious beliefs require[d] him to close his prayers in the name of Jesus Christ." *Id*. at 354.  Turner alleged that the Supreme Court's decision in *Lee* prohibited the town council from dictating the content of prayers, but the court disagreed: "We do not read *Lee* as holding that a government cannot require legislative prayers to be nonsectarian. Instead, *Lee* established that government cannot compel students to participate in a religious exercise as part of a school program." *Id*. at 355.  The court's opinion, authored by retired Supreme Court Justice O'Connor, further stated:

> Opening prayers need not serve a proselytizing function, and often are an acknowledgment of beliefs widely held among the people of this country.  So long as the prayer is not used to advance a particular religion or to disparage another faith or belief, courts ought not to parse the content of a particular prayer.
>
> *We need not decide whether the Establishment Clause compelled the Council to adopt their legislative prayer policy*, because the Establishment Clause does not absolutely dictate the form of legislative

prayer.[58]

*Id.* at 356 (emphasis added; citations omitted). Significantly, the circuit court did not state that legislative prayer must be nonsectarian. This fact is significant because the district court below had expressly held that such prayer must be nonsectarian. *See, Turner v. City Council of the City of Fredericksburg, Virginia*, Civil Action No. 3:06CV23, 2006 WL 2375715 at *3-4 (E.D. Va. Aug. 14, 2006) ("The Supreme Court and this circuit require that legislative prayer be nonsectarian."). Rather than affirming the district court's decision on that basis, the circuit court affirmed for reason stated above. Accordingly, the circuit court's decision appears to be a retreat from its earlier ruling in *Simpson*. Significantly, the circuit court's statement that it "need not *decide* whether the Establishment Clause compel[s]" a nonsectarian prayer policy clearly indicates that the issue is unsettled in the Fourth Circuit. (emphasis added).

Subsequently, in *Pelphrey*, as already discussed above, the Eleventh Circuit considered an Establishment Clause challenge to the policies of two county commissions, under which clergy from various religious denominations were invited to give legislative prayers at meetings. Despite the county's policy of inviting a variety of clergy, the great majority of the clergy were Christian. *Id.*, 547 F.3d at 1267. The county did "not compose or censor the prayers," and the prayers actually given "included references to 'Jesus,' 'Allah,' 'God of Abraham, Isaac, and Jacob,' 'Mohammed,' and 'Heavenly Father.'" *Id.*, 547 F.3d at 1266-67. The plaintiffs-

---

[58]Plaintiffs in this action insist that under *Marsh*, legislative prayer must be nonsectarian. If so, then this language from *Simpson* is very curious, since the easiest and most obvious thing for the court to have said is that the council's policy, requiring that prayers be nonsectarian, was required by *Marsh*.

appellants "argue[d] that the Establishment Clause permits only nonsectarian prayers for the meetings," but the circuit court disagreed since the defendants had not exploited the prayer opportunity, and since "[w]hether invocations of 'Lord of Lords' or 'the God of Abraham, Isaac, and Mohammed' are 'sectarian' is best left to theologians, not courts of law." *Id*. at 1266-67.   With respect to this issue, the court stated, in pertinent part:

> *Marsh*, as informed by *Allegheny* and *Lee*, controls our review of the constitutionality of legislative prayers. The district court concluded that these decisions direct us not to inquire into the content of prayers for "legislative and other deliberative public bodies" unless "the prayer opportunity has been exploited" to advance or disparage a belief, *Marsh*, 463 U.S. at 786, 794, 103 S.Ct. at 3333, 3338, or affiliated the government with a specific faith, *Allegheny*, 492 U.S. at 603, 109 S.Ct. at 3106. We agree.

> The taxpayers argue that *Marsh* permits only "nonsectarian" prayers for commission meetings, but their reading is contrary to the command of *Marsh* that courts are not to evaluate the content of the prayers absent evidence of exploitation. The taxpayers rely on the acknowledgment by the Supreme Court in *Marsh* that the chaplain had "removed all references to Christ" after 1980 and offered "nonsectarian" prayers at the time of the challenge. *Marsh*, 463 U.S. at 793 n. 14, 103 S.Ct. at 3337 n. 14. The Court provided these descriptions of the prayers in a footnote, but the Court never held that the prayers in *Marsh* were constitutional because they were "nonsectarian." *See id*. Nor did the Court define that term. *See id*. To read *Marsh* as allowing only nonsectarian prayers is at odds with the clear directive by the Court that the content of a legislative prayer "is not of concern to judges where ... there is no indication that the prayer opportunity has been exploited to proselytize or advance any one ... faith or belief." *Id*. at 794-95, 103 S.Ct. at 3337-38.

> The *Marsh* Court considered several factors to determine whether the legislative prayers had been exploited to advance one faith. The Court weighed the chaplain's religious affiliation, his tenure, and the overall nature of his prayers. *Id*. at 792-95, 103 S.Ct. at 3336-38. The "nonsectarian" nature of the chaplain's prayers was one factor in this fact-intensive analysis; it did not form the basis for a bright-line rule.

The taxpayers argue that *Allegheny* requires us to read *Marsh* narrowly to permit only nonsectarian prayer, but they are wrong. *Allegheny* does not require that legislative prayer conform to the model in *Marsh*. *Allegheny* instead reiterates the lesson of *Marsh* that legislative prayers should not "demonstrate a [government] preference for one particular sect or creed ...." *See Allegheny*, 492 U.S. at 605, 109 S.Ct. at 3107. When legislative prayers do not "have the effect of affiliating the government with any one specific faith or belief," *id*. at 603, 109 S.Ct. at 3106 (citation omitted), "it is not for [the court] to embark on a sensitive evaluation or to parse the content of a particular prayer." *Marsh*, 463 U.S. at 795, 103 S.Ct. at 3338.

We would not know where to begin to demarcate the boundary between sectarian and nonsectarian expressions, and the taxpayers have been opaque in explaining that standard. Even the individual taxpayers cannot agree on which expressions are "sectarian." Bats, one of the taxpayers, testified that a prohibition of "sectarian" references would preclude the use of "father," "Allah," and "Zoraster" but would allow "God" and "Jehovah." Selman, another taxpayer, testified, "[Y]ou can't say Jesus, ... Jehovah, ... [or] Wicca ...." Selman also deemed "lord or father" impermissible.

The taxpayers' counsel fared no better than his clients in providing a consistent and workable definition of sectarian expressions. In the district court, counsel for the taxpayers deemed "Heavenly Father" and "Lord" nonsectarian, even though his clients testified to the contrary. At the hearing for oral arguments before this Court, the taxpayers' counsel asserted two standards to determine when references are impermissibly "sectarian." Counsel for the taxpayers first stated, "It is sectarian when the ... prayer has the effect of affiliating the government with one specific faith or belief," but he later described a reference as "sectarian" when it "invokes the name of a divinity ... in which only one faith believes." Counsel had difficulty applying either standard to various religious expressions. When asked, for example, whether "King of kings" was sectarian, he replied, "King of kings may be a tough one .... It is arguably a reference to one God .... I think it is safe to conclude that it might not be sectarian."

The difficulty experienced by taxpayers' counsel is a glimpse of what county commissions, city councils, legislatures, and courts would encounter if we adopted the taxpayers' indeterminate standard. As the taxpayers' counsel conceded at oral arguments, "the line is not completely bright between sectarian and nonsectarian." On that score, we are in complete agreement with the taxpayers' counsel.

*Id*. at 1271-72. The court also summarized the various decisions of the courts of appeal interpreting *Marsh*, and concluded that they do not require legislative prayer to be nonsectarian:

> The taxpayers erroneously contend that several other circuits have read *Marsh* to permit only nonsectarian prayer. A review of the precedents of our sister circuits establishes that they have not reached a consensus on the permissibility of sectarian references in legislative prayers. Two of the circuits read *Marsh* as we do. The remaining four circuits have not reached a decision about sectarian references in legislative prayers.
>
> The Fourth Circuit has not read *Marsh* to bar legislative prayers that contain a variety of religious expressions. In its first decision to address *Marsh*, the Fourth Circuit concluded that the prayers of a city council that contained references to "Jesus Christ" were inconsistent with *Marsh* because the prayers "contain[ed] explicit references to a deity in whose divinity only those of one faith believe." *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292, 301 (4th Cir.2004). The court understood *Marsh* and *Allegheny*, as we do, to "teach that a legislative body cannot ... 'exploit' [a] prayer opportunity to 'affiliate' the Government with one specific faith or belief ...." *Id*. at 298.
>
> In its second decision, the Fourth Circuit read *Marsh*, as we do, to allow a county to invite clergy from diverse faiths to offer "a wide variety of prayers" at meetings of its governing body. *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 284 (4th Cir.2005) (Wilkinson, J.). The prayers included "wide and embracive [sic] terms" such as " 'Lord God, our creator,' 'giver and sustainer of life,' 'the God of Abraham, Isaac and Jacob,' 'the God of Abraham, of Moses, Jesus, and Mohammad,' 'Heavenly Father,' 'Lord our Governor,' 'mighty God,' 'Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator.' " *Id*. at 284.[59] The court stated that "a practice would remain constitutionally unremarkable where 'there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.' " *Id*. at 283 (*quoting Marsh*, 463 U.S. at 794-95, 103 S.Ct. at 3338). The court distinguished *Wynne* on the ground that the prayers of the city council had been exploitive because their "pervasively and exclusively sectarian nature" had "undermined ... participation by persons of all faiths in public life." *Id*.

---

[59]However, as discussed above the county specifically discouraged clergy from using the name of Jesus Christ.

The *Simpson* court praised the County for its practice of prayer being "in many ways more inclusive than that approved by the *Marsh* Court." *Id*. at 285. The County relied on voluntary clergy and "welcome[d] rabbis, imams, priests, pastors, and ministers" who represented "a wide cross-section of the County's religious leaders." *Id*. The court explained that invalidating a practice of prayer more inclusive than that upheld in *Marsh* "would achieve a particularly perverse result"; a cramped reading of *Marsh* "would push localities intent on avoiding litigation to select only one minister from only one faith." *Id*. at 287. That consequence would make "America and its public events more insular and sectarian rather than less so." *Id*.

This year, Justice Sandra Day O'Connor, writing for the Fourth Circuit, read *Marsh* to allow invocations offered during meetings of a city council. *Turner v. City Council of City of Fredericksburg, Va.*, 534 F.3d 352, 356 (4th Cir.2008). The city council permitted only nondenominational prayers at its meetings, and Turner, a member of the council who had not been allowed to offer a sectarian prayer, challenged that policy. *Id*. at 354. The Fourth Circuit upheld the policy and applied the same standard from *Marsh* that we apply today: "So long as the prayer is not used to advance a particular religion or to disparage another faith or belief, courts ought not to 'parse the content of a particular prayer.' " *Id*. at 356 (*quoting Marsh*, 463 U.S. at 795, 103 S.Ct. at 3338). Although it upheld the policy of the council, the Fourth Circuit expressly declined to hold that *Marsh* required a policy of nondenominational prayers: "We need not decide whether the Establishment Clause compelled the Council to adopt their legislative prayer policy, because the Establishment Clause does not absolutely dictate the form of legislative prayer." *Id*. Because the invocations in *Turner*, like the invocations in *Marsh*, "recognized the rich religious heritage of our country in a fashion that was designed to include members of the community, rather than to proselytize[,]" Justice O'Connor wrote that they fell "squarely within the range of conduct permitted by *Marsh* and *Simpson*." *Id*. As the Fourth Circuit recognized, *Marsh* permits a range of prayers to be offered during local, state, or federal legislative meetings. *Id*.

The Tenth Circuit also has stated that *Marsh* does not categorically prohibit prayers that invoke "particular concept[s] of God. *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1233-34, 1234 n. 10 (10th Cir.1998) (en banc). The Tenth Circuit upheld the decision of a city council to deny a citizen's request to offer a prayer that "aggressively proselytize[d] for his particular religious views and strongly disparage[d] other religious views." *Id*. at 1235. The court read *Marsh* to hold that legislative prayer is unconstitutional "when 'the prayer opportunity has been exploited to

proselytize or advance any one, or to disparage any other, faith or belief.'" *Id*. at 1233-34 (quoting *Marsh*, 463 U.S. at 794-95, 103 S.Ct. 3330).

Contrary to the taxpayers' argument, the Fifth Circuit, the Seventh Circuit, and the Ninth Circuit have not decided the constitutionality of sectarian references in legislative prayers. The decision of the Fifth Circuit that the taxpayers cite, *Doe v. Tangipahoa Parish School Board ( Doe I)*, 473 F.3d 188, 202-05 (5th Cir.2006), was fractured, with the panel split three ways, and the *en banc* court vacated that decision, granted rehearing, and remanded with instructions to dismiss for lack of standing. *Doe v. Tangipahoa Parish Sch. Bd. ( Doe II)*, 494 F.3d 494 (5th Cir.2007) (*en banc*). Although the Seventh Circuit initially stated that Marsh "hing[ed] on the nonsectarian" nature of the prayers and denied a request for a stay of an injunction against the practice of the Indiana Legislature, *Hinrichs v. Bosma ( Hinrichs I)*, 440 F.3d 393, 394-95, 399 (7th Cir.2006), the Seventh Circuit later reversed that injunction and, like the Fifth Circuit in *Doe II*, remanded with instructions to dismiss for lack of standing. *Hinrichs v. Speaker of the House of Representatives of the Ind. Gen. Assembly ( Hinrichs II)*, 506 F.3d 584, 585 (7th Cir.2007). The taxpayers also rely on *Bacus v. Palo Verde Unified School District Board of Education*, 52 Fed.Appx. 355 (9th Cir.2002) (unpublished opinion), to suggest that the Ninth Circuit has prohibited sectarian references in legislative prayers, but *Bacus* is an unpublished decision that concerned prayers offered only "in the Name of Jesus" at the meetings of a school board. *Id*. at 356. The court stated that it "need not decide whether the prayers 'in the Name of Jesus' would be a permissible solemnization of a legislature-like body, provided that invocations were, as is traditional in Congress, rotated among leaders of different faiths, sects, and denominations." *Id*. As an unpublished opinion, *Bacus* has no precedential effect in the Ninth Circuit. See Ninth Cir. R. 36-3.

The Sixth Circuit stated, in dicta, decades ago that *Marsh* permits only nonsectarian prayers, but that decision involved public school graduations, not legislative bodies. *Stein v. Plainwell Cmty. Sch.*, 822 F.2d 1406, 1409 (6th Cir.1987). The graduation ceremonies included invocations that "employ[ed] the language of Christian theology and prayer." *Id*. at 1410. The Supreme Court has since rejected the application of Marsh to prayer at public school graduations. *See Lee*, 505 U.S. at 597, 112 S.Ct. at 2660-61.

Contrary to the taxpayers' argument, there is no clear consensus among our sister circuits about sectarian references in legislative prayer, but we read *Marsh*, as the Fourth Circuit and the Tenth Circuit do, to forbid

judicial scrutiny of the content of prayers absent evidence that the legislative prayers have been exploited to advance or disparage a religion. The taxpayers would have us parse legislative prayers for sectarian references even when the practice of legislative prayers has been far more inclusive than the practice upheld in *Marsh*. We decline this role of "ecclesiastical arbiter," *Marsh*, 463 U.S. at 821, 103 S.Ct. at 3351 (Brennan, J., dissenting), for it "would achieve a particularly perverse result." *Simpson*, 404 F.3d at 287.

*Id*. at 1272-74.

Thus rejecting the notion that legislative prayer must be nonsectarian, the Eleventh Circuit proceeded to consider whether the prayer practice at issue in *Pelphrey* violated the Establishment Clause. In that regard, the court considered three factors: "the identity of the invocational speakers, the selection procedures employed, and the nature of the prayers." *Pelphrey*, 547 F.3d at 1277. As for the first factor, the court observed that although the invited clergy were "predominantly" Christian, "prayers were also offered by members of the Jewish, Unitarian, and Muslim faiths." *Id*. The court found that this factor did not support an Establishment Clause violation, since the practice was more inclusive of different religious faiths than that approved in *Marsh*. As for the second factor, the nature of the prayers, the court stated that the prayers

included references from Christianity and other faiths . . . . Most of the references were brief and occurred at the end of each prayer. Some prayers included references to "Jesus Christ," but others referenced "Allah," "Mohammed," and the Torah. Prayers included a variety of terms, such as "king of kings and lord of lords," "Heavenly Father," and "God of Abraham, Isaac, and Jacob, God of history, Lord of creation, Lord of love, our Father [.]

*Id*. at 1278. On this point, the court found that "[t]he diversity of the religious expressions, in contrast with the prayers in the Judeo-Christian tradition allowed in

69

*Marsh*, supports the finding that the prayers, taken as a whole, did not advance any particular faith." *Id*.

And, with regard to the third factor, the selection process employed, the court, as already discussed, found that the procedures employed by one of the county boards, "the County Commission," were not motivated by an improper motive. *Id*. at 1278. As to this finding, the record indicated that the county employee responsible for inviting clergy to County Commission meetings "compiled the list of potential speakers from various sources and included diverse religious institutions, including a mosque and three synagogues," and "did not exclude religious institutions based on their beliefs." *Id*. Based upon its analysis, the court concluded that the County Commission's policy did not violate the Establishment Clause.[60] On the other hand, the court conceded that there was an issue of fact as to whether the procedures employed by the other county board, the Planning Commission, were tainted by an improper motive. As to the Planning Commission, there was evidence that the employee responsible for inviting clergy had intentionally excluded certain denominations from her list of potential clergy. *Id*., 547 F.3d at 1281-1282.

Following *Pelphrey*, two district court cases have considered the constitutionality of legislative prayer practices: *Joyner v. Forsyth County, N.C.*, No. 1:07CV243, 2009 WL 3787754 (M.D.N.C. Nov. 9, 2009) ("*Joyner*") and *Doe v. Indian River Sch. Dist.*, 685 F.Supp.2d 524 (D.Del. 2010) ("*Indian River*"). In *Joyner*, the plaintiffs alleged that

---

[60]One member of the *Pelphrey* panel filed a dissenting opinion, arguing that Marsh does not permit legislative prayer at "virtually every government meeting." *Id*., 547 F.3d at 1282 (Middlebrooks, dissenting). However, he "agree[d] with much of the majority opinion, particularly with respect to the danger of the federal judiciary embarking on the editing of prayer." *Id*.

a county board of commissioners violated the Establishment Clause by "sponsoring and allowing sectarian prayer" at meetings. *Joyner*, 2009 WL 3787754 at *1. The prayers were given by invited local clergy. Initially, the county had no prayer policy, but it adopted one after the plaintiffs sued. The newly-adopted policy indicated that invited clergy could offer an invocation "according to the dictates of [his or her] conscience," provided that "the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, [or] to disparage any [other faith]," so as to maintain a "spirit of respect and ecumenism." *Id*. at *2. Prayers at board meetings "frequently contained at least one reference to Jesus, Jesus Christ, Christ Savior, or the Trinity." *Id*. at *3. None of the prayers in the court's record "invoked a deity associated with any specific faith other than Christianity." *Id*. The court, interpreting and applying Fourth Circuit law, concluded that there was a "nonsectarian maxim," forbidding sectarian prayer. *Id*. at *6-7. The court further found that

> *Marsh* requires that a divine appeal be wide-ranging, tying its legitimacy to common religious ground. Such prayer should transcend denominational boundaries and appeal broadly to the aspirations of *all citizens*.[61] Prayers consistent with *Marsh* highlight beliefs widely held. They also evoke common and inclusive themes and forswear the forbidding character of sectarian invocations.

*Id*. at *7 (emphasis added; citations and internal quotation marks omitted). Applying this standard, the court found that the challenged prayers violated the Establishment Clause, because they contained frequent references to Jesus, which prevented them from qualifying as "nonsectarian or civil prayer," and therefore had the effect of

_____

[61]Clearly an impossible goal in this Court's view. As this case illustrates, the aspiration of many citizens is to eliminate legislative prayer entirely.

promoting Christianity and affiliating the board with "a specific faith or belief." *Id*.; *see also, id*. at *8 ("[P]rayers given under Defendant's policy do not reflect . . . diversity.").

In *Indian River*, the district court considered an Establishment Clause challenge to a school board's policy of "opening its public meetings with a prayer or moment of silence." *Id*., 685 F.Supp.2d at 526. Board members were selected, on a rotating basis, to either offer a prayer or a moment of silence at the beginning of each meeting," in accordance with the freedom of conscience of the individual adult Board member." *Id*. at 529. The board's policy stated that the prayer "shall not be used or exploited to proselytize, advance or convert anyone, or to derogate or otherwise disparage any particular faith or belief," and further provided:

> Any such prayers may be sectarian or non-sectarian, denominational or non-denominational, in the name of a Supreme Being, Jehovah, Jesus Christ, Buddha, Allah, or any other person or entity, all in accord with the freedom of conscience, speech and religion of the individual Board member, and his or her particular religious heritage.

*Id*. Pursuant to this policy, some board members gave explicitly Christian prayers, while some members quoted historical figures such as George Washington, Ghandi, and Mark Twain, and others observed a moment of silence. *Id*. at 530. The court, interpreting and applying *Marsh* and its progeny, held that the sectarian nature of many of the prayers did not render them unconstitutional. *Id*. at 541 ("[T]he Court concludes that the fact that Board Members often reference Jesus Christ in their prayers does not render the Board's Pray Policy unconstitutional under *Marsh*."); *see also, id*. at 542 ("If the Court were to accept Plaintiffs' view, a reference to a particular deity in any prayer offered in a legislative or deliberative body would automatically render the practice

unconstitutional.  This conclusion cannot be squared with the reasoning in *Marsh*.").

The court continued:

> Moreover, the Court questions whether the mere reference to a deity or religious figure -whether it be "Jesus Christ," "God," "Allah," "Mohammed," or "Yahweh"- necessarily renders a prayer "sectarian." For example, the Fourth Circuit has approved of a county's practice of inviting clergy from diverse faiths to offer "a wide variety of prayers" at the meetings of its governing body.  Although the county had subsequently directed clergy to omit specific references to Jesus Christ, the Fourth Circuit determined that the prayers given at these meetings-which included references to "wide and embracive [sic] terms" such as " 'Lord God, our creator,' 'giver and sustainer of life,' 'the God of Abraham, Isaac and Jacob,' 'the God of Abraham, of Moses, Jesus, and Mohammad,' 'Heavenly Father,' 'Lord our Governor,' 'mighty God,' [and] 'Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator' "-were constitutional under *Marsh*. [(citing and quoting *Simpson*)] Notably, the Fourth Circuit expressed no disagreement with the lower court's finding that the prayers were "not controversial nor confrontational but for, at most, mention of specific Judeo-Christian references that are nevertheless clearly recognized as symbols of the universal values intended to be conveyed."  Similarly, the Eleventh Circuit has explained that the distinction between sectarian and nonsectarian prayers is anything but a bright line. [(citing Pelphrey)]

*Id*. at 542-43 (footnotes omitted).  The court further found that the school board's policy had not been used to proselytize or advance Christianity. *Id*. at 543-44 ("[T]he record before the Court demonstrates that, at most, certain Board Members briefly refer to Jesus Christ by name in concluding their prayers.  The Court does not agree that these references, by themselves, constitute 'proselytizing' or the 'advancement' of religion.") (footnote omitted).  Consequently, the court found that the school board's policy did not violate the Establishment Clause.

In the instant case, the Court is of course bound by the decisions of the Supreme Court.  However, no Supreme Court decision has addressed the precise issues and factual circumstances that are before this Court. Additionally, the Court is

not aware of any binding Second Circuit authority that is on point, and the circuit courts which have issued decisions concerning legislative prayer are divided. Nevertheless, the circuit court and district court decisions discussed above are instructive, even though they are not binding on this Court.

It is clear that outcomes in Establishment Clause cases are extremely fact specific. *See, e.g., Van Orden v. Perry*, 545 U.S. 677, 125 S.Ct. 2854, 2868-69 (2005) ("[N]o exact formula can dictate a resolution to such fact-intensive cases.") (Breyer, concurring). Here, the Court has considered the particular facts of this case in light of all of the binding and non-binding authority discussed above, and finds that the Town's prayer policy does not violate the Establishment Clause. In making that determination, the Court has considered a number of factors in light of the entire record in this case. For example, at the outset, there is no indication that the Town established its unwritten policy of having prayer before meetings for an improper purpose. That is, the Town did not begin having prayer at meetings in order "to proselytize or advance any one, or to disparage any other, faith or belief." Instead, the record indicates that Auberger initiated the policy of having prayer at meetings because he wanted to continue the prayer tradition that he had observed while a member of the Monroe County Legislature.

The Town's prayer policy, to the extent that one exists, is to invite clergy from all denominations within the Town, without any guidance or restriction on the content of prayers. The Town will also permit anyone who volunteers to give an invocation, including atheists and members of non-Judeo-Christian religions such as Wicca, and has never denied a request by anyone to deliver a prayer. Town clerical employees,

74

who have no stake in the process other than to perform the task assigned to them, have invited clergy from lists published by the Town Chamber of Commerce and local newspaper.  The clerical employees indicate that they have endeavored to include all groups listed in those publications.  The Town has no control over which religious groups are listed in those publications.  Over time the clerical employees have compiled lists of clergy who have agreed to give invocations, and the lists do not reflect all of  those who declined an invitation.

The groups listed in the Community Guide and Greece Post are overwhelmingly Christian, which reflects the fact that there are comparatively few non-Christian organizations in the Town.  Plaintiffs maintain that the Town intentionally excluded non-Christian groups listed in those publications, but the record does not support such assertion.  For example, the only purportedly non-Christian group listed in the Community Guide was the Church of Jesus Christ of Latter-Day Saints,[62] and the reasonable inference from the record is that this group did not make it onto Sofia's list because it declined her invitation.  Significantly, along with the Church of Jesus Christ of Latter-Day Saints, a number of Christian churches listed in the Community Guide

_____

[62]Plaintiffs indicate that the Church of Jesus Christ of Latter-Day Saints is a non-Christian denomination, but have offered no evidence to support that claim.  The Court observes that, according to what appears to be the official website of The Church of Jesus Christ of Latter-Day Saints, http://www.lds.org/, the church believes in the divinity of Jesus Christ, refers to Jesus Christ as "the Savior" and "the Son of God," and indicates that Jesus Christ founded the Church.  Whether the Church of Jesus Christ of Latter-Day Saints is a Christian organization is a question beyond the Court's expertise.  *See, Colorado Christian University v. Weaver*, 534 F.3d 1245, 1265 (10th Cir. 2008) ("[T]he definition of who is a 'Christian' can generate an argument in serious circles across the country. Some students at CCU are members of the Church of Jesus Christ of Latter-Day Saints, or "Mormons." Members of the LDS Church stoutly insist that they are Christians, but some Christians, with equal sincerity and sometimes vehemence, say they are not.")  But in any event, there is no indication that Sofia, Wagoner, or Fiannaca considered the group to be non-Christian.

were not included on Sofia's list.  The only non-Christian group listed in the Greece

Post, the Bahai Faith Community, was included on Fiannaca's list, and a

representative of the Bahai community gave an invocation on December 16, 2008.

Plaintiffs maintain that the Town intentionally excluded three other minority

faiths from giving invocations: A Jehovah's Witness congregation, a Vietnamese

Buddhist congregation, and Jewish synagogues located outside the Town.  Plaintiffs

allege that the Town had constructive notice of the Jehovah's Witness group, because

it once applied for a zoning permit.  Plaintiffs further state that the Town had

constructive notice of the Vietnamese Buddhist group, because a Town official was

aware of the group's existence as a result of having driven by its temple.  And finally,

Plaintiff's insist that the Town had constructive notice of the synagogues, because

Auberger was aware that there were synagogues located outside the Town.[63] *See*, Pl.

Memo in Opposition [#38] at 15 ("Town officials . . . ignored *anecdotal information*

about local minority-faith communities.") (emphasis added). The Court disagrees that

these points create a reasonable inference that the Town excluded these faiths for

religious reasons.  Significantly, there is no evidence that Sofia, Wagoner, or Fiannaca

was aware of these groups, which were not listed in the Community Guide or Greece

Post.  Plaintiffs argument in this regard seems disingenuous in any event, since even

assuming that these supposedly "disfavored minority" groups had each delivered a

prayer, Plaintiffs would no doubt still argue that the Town's selection procedure was

---

[63]Although there is evidence that some of the groups listed in the Community Guide and Greece Post were actually located outside the geographic limits of the Town, there is no indication that Sofia, Wagoner, or Fiannaca was aware of that Fact.  Moreover, Fiannaca indicated her belief that she was supposed to invited clergy from religious organizations located in the Town.

unconstitutional, since the vast majority of invited clergy would still have been Christian.[64]  In that regard, the ACLU, writing on behalf of Plaintiffs, has already indicated that the Town should invite clergy from *outside* the Town to create an acceptable level of diversity.  *See*, Footnote 39 above.

The Court has also considered the identities of the prayer-givers and the process that the Town employed in inviting clergy to deliver prayers, and finds that these factors did not have the purpose or effect of proselytizing or advancing any one, or disparaging any other, faith or belief, within the meaning of the Establishment Clause.  As discussed above, houses of worship in the Town of Greece are overwhelmingly Christian.  At their depositions, Plaintiffs could not identify a single non-Christian house of worship in the Town, despite having lived there for decades.  Moreover, the sources that town used to identify and invite clergy to deliver prayers, consisting of the Community Guide and Greece Post, were almost exclusively made up of listings for Christian churches.  Notably, there were no synagogues, mosques, or other non-Christian churches listed in either source, with the exception of the Bahai faith, and possibly the Church of Jesus Christ of Latter-Day Saints.[65]  And as the Court has already observed, there is no indication that Sofia, Wagoner, or Fiannaca intentionally excluded any non-Christian denomination.  Moreover, a wide variety of

---

[64]*See*, Pl. Memo in Opposition [#38] at 15 ("Four prayers [33%] in 2008 were offered by non-Christians, but all those occurred only because Defendants were facing litigation and not because their prayer practice had genuinely been opened to minority faiths."); *see also, id*. at 17 (Referring to addition of minority faiths to clergy lists as "token gestures," since "the Town continues to act with an impermissible religious motive."); *id*. at 19 ("[W]hile the Town may have now altered its practices, the changes do not alter the basic, discriminatory structure of the system.").

[65]*See*, Footnote 63.

Christian denominations were invited to deliver prayers, including Assemblies of God, Catholic, Presbyterian, Methodist, Lutheran, Pentecostal, and non-denominational. Additionally, town officials advised Plaintiffs that anyone, including an atheist, was welcome to offer an invocation. Furthermore, after Plaintiffs complained, representatives of the Jewish, Bahai, and Wicca faiths, volunteered to give invocations and were permitted to do so. The Town's willingness to rotate the prayer opportunity amongst various denominations, each with their own particular beliefs, belies any attempt to proselytize or advance any one, or to disparage any other, faith or belief.

Lastly, the Court has considered the nature of the prayers, and finds that they did not proselytize or advance any one, or disparage any other, faith or belief. It is undisputed that the vast majority of prayers at issue in this case were offered by Christian clergy, and that many of them contained at least one reference to Jesus Christ. On this point, as the Court noted earlier, many of the prayers end with the phrase, "in Jesus' name," or similar language. Otherwise, though, most of the prayers that Plaintiffs maintain are sectarian are indistinguishable from prayers that they say are non-sectarian. Some of the allegedly sectarian prayers contain no reference to Jesus or any other deity. None of the allegedly sectarian Christian prayers disparaged other religions or attempted to convert anyone.

Plaintiffs maintain that some of the prayers "have been aggressively proselytizing," but they neglect to include any citation to the record so it is unclear

which prayers they mean. (Plaintiff's Reply Memo [#43] at 12).[66]  Nevertheless, the

Court does not view any of the prayers in the record as being either aggressive or

proselytizing.  The mere fact that prayers may contain a reference to Jesus or another

deity does not make them proselytizing.   Instead, limited references such as, "in

Jesus's name," are, under the facts of this case, "tolerable acknowledgment[s] of

beliefs widely held among the people of this country." *Marsh*, 103 S.Ct. at 3336.

Plaintiffs maintain, however, that sectarian legislative prayers necessarily violate

the Establishment Clause.  In that regard, Plaintiffs contend that prayers may only

refer to a "generic God," and must not refer to any particular deity or to any religious

belief, such as the Holy Trinity, that is specific to a particular religion or group of

religions.  Plaintiff's further maintain that to prevent sectarian prayer, the Town must

instruct potential prayer-givers to give inclusive ecumenical prayers.  The Court

disagrees.

It is clear to this Court that *Marsh* does not require that legislative prayer be

non-sectarian.  To the contrary, *Marsh* upheld the constitutionality of legislative prayer,

thereby specifically carving out a unique exception to the *Lemon* test, based primarily if

not exclusively on the long history of legislative prayer in Congress, which is often

---

[66]Perhaps Plaintiffs are referring to one occasion when an invited clergyman asked the audience to stand for the prayer. *See*, Pl. Memo in Opposition [#38] at 9; Pl. Appendix of Exhibits, Ex. 616 (Clergyman asks audience, who had been standing for the Pledge of Allegiance, to again stand for the prayer: "Please let us stand again once more.  Let's stand please."). The Court does not consider such a request to be aggressive proselytization.   And in any event, as shown above, Plaintiffs characterized two separate prayers as nonsectarian, even though one prayer asked the audience to bow its heads and the other asked the audience to stand.

overtly sectarian.[67] *See, Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d at 213-213

(Clement, J., dissenting) ("The content of congressional prayer, referred to by the

*Marsh* Court as exemplifying permissible legislative prayer, traditionally has included

sectarian references.  In addition, Congress continues to permit sectarian invocations,

as it has since the practice's inception.").  On this point, the Court takes judicial notice

of just two recent prayers given at the beginning of sessions of the United States

House of Representatives.  On April 15, 2010, the Rev. Clyde Mighells, of Lighthouse

Reformed Church, gave the opening prayer in the House, which ended with the words,

"It is in the blessed name of our Lord, Jesus Christ, that we lay these requests at Your

feet. Amen." 156 CONG. REC. H2581 (daily ed. April 15, 2010).  And on June 30, 2010,

the Rev. Robert Henderson, of First Baptist Church, Lincoln, Illinois, offered the

opening prayer in the House, which ended with the words, "These things we pray in the

name of our Lord Jesus Christ.  Amen." 156 CONG. REC. H5205 (daily ed. June 30,

2010).[68]  These prayers are indistinguishable from some of those being challenged in

this case, and according to *Marsh*, "it would be incongruous to interpret [the

---

[67] *See*, Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 Colum.L.Rev. 2083, 2104 (1996) ("The First Congress enacted legislation providing for chaplains for both the House of Representatives and the Senate.  Congressional chaplains have led daily prayers in Congress since that time. And from America's earliest days to the present times, the prayers delivered by these chaplains have been true sacral prayers, and many of them, true Christian prayers. *Indeed, within the last six years alone, over two hundred and fifty opening prayers delivered by congressional chaplains have included supplications to Jesus Christ*.") (emphasis added).

[68] Reverend Henderson and Reverend Mighells were both Guest Chaplains, who gave their invocations under the sponsorship of particular Members of the House.  The official chaplain of the House of Representatives, the Rev. Daniel P. Coughlin, maintains a website for the Office of the Chaplain of the House, which states, in pertinent part:  "One of the special privileges and great joys of being House Chaplain is to welcome guest chaplains who have been recommended by the Members of Congress. This is a wonderful opportunity to affirm pastoral leaders from many different backgrounds. This practice manifests the freedom of worship enjoyed across this nation." *See*, http://chaplain.house.gov/chaplaincy/guest_chaplains.html

Establishment Clause] as imposing more stringent First Amendment limits on the

States than the draftsmen imposed on the Federal Government." *Marsh*, 103 S.Ct. at

3335.

The Supreme Court's decision in *Allegheny* does not compel a contrary ruling.

As already mentioned, the majority decision in *Allegheny* stated that, "The legislative

prayers involved in *Marsh* did not violate [the Establishment Clause] because the

particular chaplain had removed all references to Christ." *Allegheny*, 109 S.Ct. at 3106

(citation and internal quotation marks omitted). That statement is binding on this

Court. Nevertheless, the statement does not indicate that legislative prayers must be

nonsectarian. The facts of *Marsh* were, of course, that a single clergyman of a single

Christian denomination had been the chaplain of the Nebraska legislature for sixteen

years. Under those facts, the Supreme Court may have found it significant, in denying

the Establishment Clause challenge, that the chaplain had deleted all references to

Christ, albeit belatedly, because otherwise it might have appeared that Nebraska was

advancing a particular faith. In this case, though, the facts are entirely different, since

the Town has rotated the prayer opportunity amongst numerous clergy of a variety of

denominations. Where, as here, a legislature permits a variety of clergy to give

invocations, there is arguably less likelihood that the government could be viewed as

advancing a particular religion, and therefore less concern over the sectarian nature of

particular prayers. In any event, under *Marsh*, the issue is not whether the prayer is

sectarian or non-sectarian, but whether, based on the totality of the circumstances, the

prayer is being exploited to advance or disparage a belief, or to associate the

government with a particular religion.

The Court also disagrees with Plaintiffs' contention that the Town must, or even can, instruct potential prayer-givers that prayers should be "inclusive and ecumenical."[69] In *Lee*, the Supreme Court characterized the defendant school's similar instruction to an invited rabbi as an impermissible attempt by government to control the content of prayer. *Lee*, 112 S.Ct. at 2656; *see also, id.* at 2658 ("A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed."). The Court finds that the policy requested by Plaintiffs would violate *Lee*, since it would likewise impose a state-created orthodoxy. In this regard, the Court respectfully disagrees with the Fourth Circuit's decision in *Turner*.

Moreover, the Court finds that Plaintiff's proposed non-sectarian policy, which would require Town officials to differentiate between sectarian prayers and non-sectarian prayers, is vague and unworkable, as *Pelphrey* demonstrates. The instant case illustrates the illusory nature of so-called nonsectarian prayer, since as shown above, many of the prayers that Plaintiffs say are sectarian are indistinguishable from prayers that they say are not.

Considering all of these factors, and in light of the undisputed facts of this case, the Court finds as a matter of law that the Town did not violate the Establishment

---

[69]Plaintiffs indicate that Town officials should "ask invited clergy to keep the prayers ecumenical and inclusive or Christians and non-Christians alike," and that the officials could then "reasonably assume that clergy who accept an invitation to deliver a nonsectarian prayer will make a good-faith effort to comply with the terms of the invitation, and no pre-screening of the prayer would be needed." Pl. Memo in Opposition [#38] at 13. Plaintiffs thus indicate that the non-sectarian requirement is a condition or term of the invitation.

Clause.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [#33] is granted, Plaintiffs' motion for summary judgment [#32] is denied, and this action is dismissed.

SO ORDERED.

Dated: Rochester, New York
     August 5, 2010

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge